Michael D. ST. CLAIR, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 1999–SC–0029–MR.

Supreme Court of Kentucky.

Feb. 19, 2004.

AS Modified Feb. 23, 2004.

Rehearing Denied Aug. 26, 2004.

512

514

Donna L. Boyce, Appellate Branch Manager, Department of Public Advocacy, Julie Namkin, Assistant Public Advocate, Frankfort, Counsel for Appellant.

Gregory D. Stumbo, Attorney General, David A. Smith, Tami Allen Stetler, Brian T. Judy, Assistant Attorneys General, Criminal Appellate Division, Frankfort, Counsel for Appellee.

## OPINION OF THE COURT

### I. INTRODUCTION

A Bullitt Circuit Court jury found Appellant, Michael D. St. Clair, guilty of murdering Frances C. Brady. At the subsequent capital sentencing proceeding, the jury found the presence of an aggravating circumstance and fixed Appellant's punishment at death. The trial court entered judgment in accordance with the jury's verdict, and Appellant now brings this matter of right appeal, KY. CONST. § 110(2)(b); KRS 532.075(1), in which he asserts fifty-eight (58) [1] claims of error. After a review of the record, we affirm Appellant's Murder conviction, but reverse

---

1. In his brief to this Court, Appellant initially raised fifty-nine (59) allegations of error, but Appellant subsequently moved the Court for leave to withdraw argument # 16 ("Illegal Extradition Requires Return to Oklahoma"), and we granted Appellant's motion.

his death sentence and remand the case for the trial court to conduct a new capital sentencing phase because the trial court's instructions erroneously failed to permit the jury to consider a sentence of life without possibility of probation or parole ("LWOP").

## II. FACTUAL BACKGROUND

In September 1991, while he was awaiting final sentencing for two (2) Oklahoma state Murder convictions, Appellant escaped from a jail in Durant, Oklahoma, accompanied by another inmate, Dennis Gene Reese ("Reese"). The two men fled from the facility in a vehicle—a pickup truck—stolen from a jail employee and, when that truck soon ran out of gas, stole another pickup truck, a handgun, and some ammunition from the nearby home of Vernon Stephens ("Stephens") and fled Oklahoma for the suburbs of Dallas, Texas. Appellant's then-wife, Bylynn, met the men in Texas and brought them money, clothing, and other items. When Reese was subsequently arrested several months later in Las Vegas, Nevada, he confessed to his involvement in an ensuing crime spree.

According to Reese, after hiding out in Dallas for a few days, the men: (1) boarded a Greyhound bus bound for the Pacific Northwest but disembarked in Colorado, where Appellant kidnapped a man, Timothy Keeling ("Keeling"), and took his vehicle—again, a pickup truck—and Appellant and Reese began driving back towards Texas; (2) while driving through New Mexico, but approaching the Texas border, Appellant used the stolen handgun to execute Keeling in the desert; (3) the men then drove Keeling's pickup truck to New Orleans, Louisiana, for a brief time and then drove north though Arkansas and Tennessee before ending up in Hardin County, Kentucky, where Appellant kidnapped another man, Frances C. Brady ("Brady") and took his vehicle—another

pickup truck; (4) the men then set fire to Keeling's pickup truck in order to destroy any incriminating evidence and Appellant used his handgun to execute Brady in a secluded area of Bullitt County, Kentucky; (5) shortly thereafter, when Kentucky State Trooper Herbert Bennett ("Trooper Bennett") initiated a traffic stop of Brady's vehicle, which Appellant and Reese were then driving, Appellant fired shots from his handgun that struck Trooper Bennett's cruiser; and (6) during an ensuing flight—initially in Brady's pickup and subsequently on foot—Reese was able to split away from Appellant and had no further contact with him prior to his arrest.

In February 1992, a Bullitt County Grand Jury returned an indictment that charged that "[o]n or about the 6th day of October, 1991, in Bullitt County, Kentucky, [Reese and Appellant] did commit capital murder by shooting Frances C. Brady with a pistol." Subsequently, the Commonwealth filed a Notice of Intent to Seek Death Penalty as to Appellant in which it stated that "[p]ursuant to KRS 532.025, the Commonwealth will introduce evidence of aggravating circumstances sufficient to warrant imposition of the death penalty, specifically that the defendant has a prior record of conviction for capital offenses[.]" Reese entered into a plea agreement with the Commonwealth and agreed to testify against Appellant. Appellant pled not guilty and his case was tried before a jury in August and September 1998.

At trial, Appellant employed an alibi defense and contended that, although he had accompanied Reese to New Orleans for a few days after their initial flight to Dallas, the men had parted ways upon their return to Dallas, and soon thereafter he returned to Oklahoma where he hid out on the farm of a family friend until shortly before he was recaptured in December 1991. Appellant denied accompanying

Reese to Colorado or New Mexico and further denied that he had ever been in Kentucky. Accordingly, the primary issue for jury resolution at trial was whether Appellant or someone else—specifically Reese and/or an unidentified accomplice—had murdered Brady.

The Commonwealth's theory of the case was that Appellant himself shot and killed Brady. In addition to Reese's testimony, the Commonwealth proved its case through (1) Trooper Bennett's identification of Appellant as the man who had fired two shots in his direction on the night of the murder; (2) another man's identification of Appellant and Reese as being in possession of a vehicle similar to Brady's vehicle at a gas station/convenience store in the area; (3) testimony relating to telephone calls made to Appellant's friends and relatives back in Oklahoma from a payphone located at this same gas station/convenience store; (4) testimony identifying items found in Kentucky—on the victim's person and in his pickup truck—as similar to or the same items that Appellant's then-wife had given to Appellant and Reese when she met them in Texas; (5) a jailhouse informant, Scott Kincaid ("Kincaid"), who testified that Appellant had admitted his involvement in the crime; (6) ballistics evidence demonstrating that the same handgun could have fired the shots that killed both Keeling and Brady and damaged Trooper Bennett's cruiser and bullet composition evidence suggesting that bullets from the same box killed Keeling and Brady; and (7) testimony to the effect that Appellant's fingerprints were found both on items recovered from inside the Brady vehicle and on the outside door of the same vehicle.

At the conclusion of the culpability phase, the jury found Appellant guilty of Murder under the only Murder instruction given by the trial court:

### INSTRUCTION NO. 1—MURDER

You will find the defendant guilty of Murder under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt that in this county on or about October 6, 1991, and before the finding of the Indictment herein, he, alone or in complicity with another, intentionally killed Frances C. Brady.[2]

The case then proceeded to a capital sentencing phase where the jury found the only aggravating circumstance identified in the trial court's instructions, i.e., "the Defendant has a prior record of conviction for murder, a capital offense," and fixed Appellant's punishment at death. This appeal followed.

### III. ANALYSIS

### A. FAILURE TO INSTRUCT AS TO LWOP

■ Appellant was tried in August and September 1998 for conduct that he committed in October 1991. On July 15, 1998, new capital sentencing provisions of the 1998 General Assembly's omnibus crime legislation, HB 455, took effect, and a sentence of life without possibility of probation or parole ("LWOP") became a sentencing option in capital cases. KRS 446.110 provides: "If any penalty, forfeiture or punishment is mitigated by any provision of the new law, such provision may, by the consent of the party affected, be applied to any judgment pronounced

---

2. Instruction No. 2 defined "complicity" as meaning "that a person is guilty of an offense committed by another person when, with the intention of promoting or facilitating the commission of the offense, he solicits, commands, or engages in a conspiracy with such other person to commit the offense, or aids, counsels, or attempts to aid such person in planning or committing the offense."

after the new law takes effect." In a pretrial motion submitted by defense counsel, Appellant advised the trial court of the change in the law, stated that "[t]he accused hereby consents to application of the 1998 amendments to KRS 532.030," and moved the trial court to include LWOP as a sentencing option available to the jury if the trial proceeded to a capital sentencing phase. As was the case in *Furnish v. Commonwealth*, Ky., 95 S.W.3d 34, 50–51 (2002), *cert. denied* —— U.S. ——, 124 S.Ct. 115, 157 L.Ed.2d 80 (2003), the trial court declined to instruct the jury regarding LWOP because it concluded that the previously available capital sentencing options were not "clearly mitigated" by the new penalties. A majority of this Court, however, subsequently reached the opposite conclusion when certifying the law in *Commonwealth v. Phon*, Ky., 17 S.W.3d 106, 108 (2000) ("[U]pon the unqualified consent of the defendant, a sentence of life without parole may be lawfully imposed for capital crimes committed before July 15, 1998.").

The Commonwealth now argues that although the trial court identified an erroneous basis for its ruling below, it correctly declined to instruct the jury on LWOP because the record does not contain evidence of Appellant's personal and unqualified consent to an LWOP instruction. In *Furnish*, this Court rejected the Commonwealth's identical argument, and we do so again today. In response to the Commonwealth's suggestion that KRS 446.110 permits trial courts to exercise discretion whether to instruct on LWOP in capital cases, we recognize that such an interpretation would permit inconsistency in capital sentencing procedures that is incompatible with due process. Accordingly, we hold that "Appellant's motion satisfied the 'unqualified consent' requirement we established in *Phon*, and he was entitled to receive an instruction on life without parole." *Furnish*, 95 S.W.3d at 51. *Com-*

*pare Garland v. Commonwealth*, Ky., 127 S.W.3d 529, 537–38 (2003) (where the defendant made no request for an LWOP instruction). We find no merit in the Commonwealth's contention in its brief that the instructional error in this case was harmless. Accordingly, we reverse Appellant's death sentence and remand this case to the trial court for a new capital sentencing phase.

Our reversal of Appellant's death sentence and remand for a new capital sentencing phase renders moot or partially moot several of Appellant's allegations of error. Accordingly, this opinion will not address Appellant's boiler-plate objections to the death penalty, *i.e.*, # 53 ("Death Sentence Disproportionate to Co–Indictee's Sentence"), # 54 ("Kentucky's Disproportionality Review is Unconstitutional"), # 55 ("Residual Doubt Bars Death Sentence"), # 56 ("Constitutional Challenges to Death Penalty"), and # 58 ("No Access to Data"), which Appellant may assert upon remand and then pursue upon appeal if he again receives a death sentence. Nor will we address other allegations of error that we would characterize as unique to the capital sentencing phase at Appellant's previous trial, *i.e.*, # 9 ("Immediate Sentencing of St. Clair"), # 10 ("Exclusion of Sentencing Hearing Avowals"), portions of # 27 ("Improper Penalty Phase Closing Argument"), # 32 ("Denial of Motion to Recuse"), # 49 ("Commonwealth Hugging Victim's Family After Guilty Verdict"), and # 52 ("Coerced Death Sentence"). We address each of Appellant's remaining allegations of error, but address the ones that relate exclusively to capital sentencing only to the extent that they may be relevant to proceedings upon remand. Although we will identify each argument by both subject matter and number, we have reorganized Appellant's claims according to the nature of the asserted error rather than its sequential place in Appellant's

brief, and we will address the allegations in our reorganized order.

## B. PRETRIAL ISSUES

### 1. *SPEEDY TRIAL (# 17)*

Appellant was indicted in February 1992 and was extradited from Oklahoma to Kentucky to stand trial under this indictment in May 1995. Appellant's trial did not begin, however, until August 18, 1998. Appellant argues that the Commonwealth of Kentucky's delay in bringing him to trial violated both: (1) statutory provisions of the Interstate Agreement on Detainers ("I.A.D."), KRS 440.450, and (2) his federal and state constitutional rights to a speedy trial. Appellant thus argues that this Court should reverse his conviction and remand this case to the trial court with instructions to dismiss the indictment.

■■■ KRS 440.450(Art. IV(3)) provides:

> *In respect of any proceeding made possible by this Article,* trial shall be commenced within one hundred twenty (120) days of the arrival of the prisoner in the receiving state, but for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance. (Emphasis added).

Thus, "[i]f the prosecuting authority initiates proceedings, the prisoner must be tried within 120 days after his arrival in the jurisdiction seeking to try him[,]" *Roberson v. Commonwealth,* Ky., 913 S.W.2d 310, 312 (1994), and if the time limitations are violated, "the trial court is compelled to dismiss the charges with prejudice."

*Id.* at 313; *Lovitt v. Commonwealth,* Ky., 592 S.W.2d 133 (1979).

■■■ In this case, however, we agree with the Commonwealth that the I.A.D.'s 120–day clock provision was inapplicable to this indictment. Kentucky did not utilize the I.A.D. to obtain custody of Appellant. Instead, Kentucky obtained custody of Appellant by extraditing him pursuant to an executive agreement authorized by the Uniform Criminal Extradition Act ("U.C.E.A."). *See* KRS 440.200(1). Appellant correctly observes that the I.A.D.'s 120–day clock may govern even in cases where the receiving state ultimately obtains custody of the accused through means other than the I.A.D. because the United States Supreme Court has held that the I.A.D.'s time limit applies whenever a requesting state "initiates the disposition of charges underlying a detainer it has previously lodged against a state prisoner[,]" *United States v. Mauro,* 436 U.S. 340, 364, 98 S.Ct. 1834, 56 L.Ed.2d 329, 349 (1978). However, given that Appellant has not cited us to any evidence in the record to show that the Commonwealth of Kentucky ever filed a detainer [3] with Oklahoma authorities, we hold that the I.A.D.'s 120–day clock was inapplicable to this indictment.

■■■ The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial[.]" Section Eleven of the Kentucky Constitution likewise provides that an accused "shall have a speedy public trial by an impartial jury of the vicinage." This Court analyzes allegations of speedy trial right violations under the four-factor test

---

**3.** "A detainer is 'a request filed by a criminal justice agency with the institution in which a prisoner is incarcerated, asking the institution to either hold the prisoner for the agency or to notify the agency when release of the pris-

oner is imminent.'" *Dunaway v. Commonwealth,* Ky., 60 S.W.3d 563, 566 (2001) (quoting *Carchman v. Nash,* 473 U.S. 716, 105 S.Ct. 3401, 87 L.Ed.2d 516 (1985)).

outlined in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), which requires an examination of: (1) the length of delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) the prejudice to the defendant caused by the delay. This Court has observed, however, that "[n]o single one of these factors is ultimately determinative by itself," *Gabow v. Commonwealth*, Ky., 34 S.W.3d 63, 70 (2000), and "can be determined only on an *ad hoc* balancing basis[.]" *Id.* (quoting *Barker v. Wingo*, 407 U.S. at 514, 92 S.Ct. at 2184). We conclude that the delay in bringing Appellant to trial did not violate his rights to a speedy trial.

The first factor of the inquiry requires a showing of a presumptively prejudical delay, and we conclude that the approximately six and one-half (6½) years between indictment and trial in this case is sufficient to trigger further inquiry. *See Barker v. Wingo* (holding that a five (5) year delay in a murder prosecution was presumptively prejudicial); *Gabow* (thirty-four (34) month delay in murder case). And, jumping ahead slightly to the third factor, it is clear that, after he was extradited to Kentucky—but, significantly, not before—Appellant affirmatively and repeatedly asserted his right to a speedy trial in the trial court. Although Appellant's assertions of his rights are " 'entitled to strong evidentiary weight' in deciding whether the defendant's rights were violated," *Dunaway v. Commonwealth*, 60 S.W.3d at 571 (quoting *Barker v. Wingo*, 407 U.S. at 531, 92 S.Ct. at 2192, 33 L.Ed.2d at 117), we find no speedy trial violation under the facts presented because: (1) the majority of the delay occurred while Appellant was incarcerated in Oklahoma and prior to any assertion by Appellant of his right to a speedy trial; (2) the lion's share of the remaining delay was attributable to defense-requested continuances; and (3) Appellant's unwarranted assertions fail to demonstrate that he suf-

fered prejudice as a result of this additional delay.

Just over seventy-eight (78) months passed between the time Appellant was indicted in February 1992 and the time his trial commenced in August 1998. Fully half of this time—thirty-nine months (39)—elapsed before Appellant was extradited from Oklahoma to Kentucky. During the remaining thirty-nine (39) months, five (5) trial dates were rescheduled—four (4) at the request of the defense and one (1) at the request of the Commonwealth:

● The originally scheduled trial date of August 14, 1995 was rescheduled for May 7, 1996 after Appellant's initial trial attorneys, Ray Clooney and Richard Receveur, filed a motion to withdraw as counsel of record less than a week prior to the scheduled trial date because of a Department of Public Advocacy Policy that prevented it from contracting with Clooney for his services because he had filed to run for public office and substitute counsel Ronald Riggs informed the trial court that he required "at least six months" to obtain mitigation evidence from Oklahoma.

● The May 7, 1996 trial date was rescheduled for January 1, 1997 after Riggs filed a motion to withdraw (citing "a total, complete, and severe breakdown of communications between counsel and the Defendant") and substitute counsel, Catherine Rao–Kamenish and Mary Jo Wicker, advised the court that their schedules would not permit a death penalty trial until December or the following year.

● The January 14, 1997 trial date was rescheduled for August 12, 1997, *without objection from the defense,* on the Commonwealth's motion to continue because the lead prosecuting attorney had recently left the Office of the Attorney

General to accept a position as an Assistant United States Attorney.

●The August 12, 1997 trial date was rescheduled for April 21, 1998 *without objection from the defense* after Rao–Kamenish and Wicker moved to withdraw because Appellant had begun treating the attorney-client relationship as amorous, *e.g.*, composing poems which professed his romantic intentions towards his counsel and sending them artwork that depicted naked women.

●The April 21, 1998 trial date was rescheduled to August 18, 1998 at the defense's request to allow it to investigate an incriminating statement allegedly made by Appellant to Kincaid while Appellant was incarcerated in Oklahoma.

Appellant's trial ultimately began on August 18, 1998. Appellant argues that the Commonwealth bears the responsibility for the majority of the post-indictment delay, specifically: (1) the thirty-nine (39) months that Appellant remained incarcerated in Oklahoma before the Commonwealth obtained custody of him; (2) the postponement of the original trial date, which Appellant contends was unnecessary; (3) the postponement of the January 14, 1997 trial date at the request of the Commonwealth; and (4) the postponement of the April 21, 1998 trial date, which Appellant contends was made necessary by the Commonwealth's failure to provide timely discovery.

■ When a person under indictment is incarcerated in another jurisdiction, "*[u]pon ... demand* [the Commonwealth has] a constitutional duty to make a diligent, good-faith effort" to obtain custody of that person for purposes of trial. *Smith v. Hooey*, 393 U.S. 374, 383, 89 S.Ct. 575, 579–80, 21 L.Ed.2d 607, 614 (1969) (emphasis added). *See also Dickey v. Florida,* 398 U.S. 30, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970). Appellant, however, not only failed to make such a demand upon the Kentucky

authorities, but actively resisted extradition by filing a habeas corpus action. It is clear from the record in this case that Appellant raised no issue with respect to his speedy trial rights until *after* he was extradited to Kentucky. Additionally, the Commonwealth's capital sentencing phase evidence demonstrates that, before the extradition agreement was signed, the State of Oklahoma tried Appellant on two (2) outstanding murder charges in February 1994, which suggests that the delay in obtaining custody of Appellant may not have been solely attributable to a lack of effort on the part of the Commonwealth of Kentucky. Accordingly, Appellant's speedy trial claim hinges on the thirty-nine (39) months of delay that occurred *after* he was returned to Kentucky.

We observe that a substantial portion of those delays were at the request of or with the tacit consent of the defense. Even if we were to resolve every "whose responsibility?" dispute as to the post-extradition delays in Appellant's favor, however, it is clear that Appellant has failed to demonstrate prejudice from this post-extradition delay. And, if not incarcerated pending trial in Kentucky, Appellant would have been incarcerated in Oklahoma under his life sentences without possibility of parole, and we find no merit in Appellant's unsupported allegations that the conditions of his imprisonment in Kentucky demonstrate prejudice associated with the delay. We find equally unpersuasive Appellant's conclusory assertion that he suffered anxiety from the delay in a resolution of his case. *See Preston v. Commonwealth,* Ky. App., 898 S.W.2d 504, 507 (1995). Although Appellant argues that his ability to mount a defense was impaired by the delay, we have examined each of Appellant's specific complaints and have determined that they fail to demonstrate any identifiable prejudice from the additional delay that occurred *after* he was transported to

Kentucky. Accordingly, "[w]e conclude that the delay in bringing this case to trial does not justify 'the unsatisfactory severe remedy of dismissal.'" *Gabow*, 34 S.W.3d at 70 (quoting *Barker v. Wingo*, 407 U.S. at 522, 92 S.Ct. at 2188).

### 2. CLIENT–COUNSEL ACCESS (# 37)

■ Appellant argues that his ability to communicate confidentially with his trial counsel on a regular basis was impeded by his pretrial incarceration in facilities first in the Jefferson County Jail and then the Kentucky State Penitentiary, where he was transferred "some time between October 17, 1997 and March 1998" apparently without a court order and, in fact, in contravention of the trial court's order directing that Appellant be transferred to the nearby Hardin County Detention Center as soon as space was available. Appellant's brief identifies no motion for relief with respect to this issue that was denied by the trial court. In fact, the record reflects that, three (3) weeks before trial, when Appellant's trial counsel moved the trial court to order Appellant's transfer to the Hardin County Detention Center, the trial court granted the motion with no objection from the Commonwealth, Accordingly, "[t]he trial judge responded in a reasonable fashion to defense requests," *Epperson v. Commonwealth*, Ky., 809 S.W.2d 835, 841 (1990), and "[t]here was no deficiency . . . compromising the right of . . . appellant to effective counsel." *Id.* We hold that the trial court properly addressed the concerns raised by Appellant, and we find no error.

### 3. DENIAL OF FUNDS FOR IN-DEPENDENT PSYCHIA-TRIST (# 40)

■ The trial court properly denied Appellant's request for funds to retain an independent psychiatrist because Appellant failed to demonstrate that such funds were reasonably necessary to the defense.

Appellant's motion for funds contained only conclusory assertions that "[e]mployment of a forensic psychiatrist is an absolute necessity because this Defendant has already been convicted in the state of Oklahoma of four murders" and that "it would be ineffective assistance of counsel not to have this Defendant . . . evaluated by a competent Forensic Psychiatrist in order to determine the mental health defenses, including mental illness and the IQ of the Defendant." When the motion came before the court for a hearing, Appellant's trial counsel stated that he had spoken with a psychologist "in Oklahoma that did the work-up on Mr. St. Clair," but counsel gave no indication of the substance of that conversation—either at that time or subsequently. In denying the request for funds, the trial court observed that "you're telling me that you believe you need one but don't know why you need one" and indicated that "if you can convince me of a need . . . I'll reconsider." The trial court's ruling was correct. "[O]ur review of a trial court's denial of funds pursuant to KRS 31.110 is limited to the reasons actually presented to the trial court." *Dillingham v. Commonwealth*, Ky., 995 S.W.2d 377, 381 (1999). Appellant had no "right to a psychiatric fishing expedition at public expense," *Kordenbrock v. Commonwealth*, Ky., 700 S.W.2d 384, 387 (1985). "There is no violation of due process in the refusal to provide for expert witnesses when the defendant offers little more than an undeveloped assertion that the requested assistance would be beneficial." *Simmons v. Commonwealth*, Ky., 746 S.W.2d 393, 395 (1988) (citing *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985)). *See also McKinney v. Commonwealth*, Ky., 60 S.W.3d 499, 505 (2001).

### 4. PROSECUTION BY ATTORNEY GENERAL'S OFFICE (# 41)

■ We find no merit in Appellant's unpreserved allegation that the Office of

the Attorney General improperly prosecuted his indictment. Section 93 of the Kentucky Constitution provides that the duties and responsibilities of Constitutional State Officers, including the Attorney General, "shall be prescribed by law." Accordingly, our statutes make the Attorney General "the chief law officer of the Commonwealth[.]" KRS 15.020. And, "[t]o encourage cooperation among law enforcement officers[,] . . . to provide for the general supervision of criminal justice[,] . . . and . . . to maintain uniform and efficient enforcement of the criminal law and the administration of criminal justice throughout the Commonwealth," *Commonwealth v. Wilson*, Ky., 622 S.W.2d 912, 914 (1981), the General Assembly has enacted KRS 15.700, which establishes a unified integrated prosecutor system in Kentucky "with the Attorney General as chief prosecutor of the Commonwealth." Given that the Attorney General "may act as prosecutor . . . when so directed by statute," *Graham v. Mills*, Ky., 694 S.W.2d 698, 701 (1985), the General Assembly has enacted a number of statutory provisions that authorize the Attorney General to prosecute criminal actions under certain circumstances. *See, e.g.* KRS 15.190 (when requested to do so in writing by a County or Commonwealth Attorney); KRS 15.200 (when requested to do so in writing by other identified officers); KRS 15.225 (prosecution of county financial administration); KRS 15.231 (theft of identity and trafficking in stolen identity cases); KRS 15.240 (violations by abortion facilities); KRS 15.242–15.243 (enforcement of election laws); KRS 15.715 (when authorized to do so by the Prosecutors' Advisory Council). By authorizing the Attorney general to direct the investigation and prosecution of criminal actions only in "given, limited situation[s]," *Hancock v. Schroering*, Ky., 481 S.W.2d 57, 61 (1972), "[t]he legislature has provided a check to prevent the Attorney General from usurp-

ing and pre-empting the office of Commonwealth's attorney[.]" *Id.*

Although Appellant is correct that the record in this case does not demonstrate the means by which the Attorney General assumed the prosecution of this indictment, the record is equally clear that neither Appellant nor any local prosecuting authority raised any objection to the Attorney General's role in this prosecution. Of course, the "issue" concerns the Attorney General's authority to prosecute this indictment would have been resolved conclusively in the trial court if Appellant had voiced any objection because the Attorney General's office could have identified its authority on the record (and, if prosecution was assumed pursuant to KRS 15.190 or KRS 15.200, included within the record the written request that they do so). Accordingly, while we observe that in future cases where the Attorney General assumes the role as lead prosecutor it would be a better practice for the Attorney General's office to make a record of its authority to prosecute an indictment, we hold that a presumption of regularity attaches in such cases—particularly when no objection is raised—and we are unwilling to assume wrongdoing from the silent record in this case. As such, we hold that the office of the Attorney General properly prosecuted this case against Appellant.

## C. JURY SELECTION ISSUES

### 1. *JURY QUESTIONNAIRE (# 44)*

 The trial court ruled consistently with this Court's prior precedent, *Sanborn v. Commonwealth*, Ky., 754 S.W.2d 534, 546 (1988) and was "well within the scope of his discretion to control the scope of voir dire examination," *Jacobs v. Commonwealth*, Ky., 58 S.W.3d 435, 444 (2001), when it denied Appellant's request that all prospective jurors be required to complete

a four (4) page, forty-one (41) question "Juror's Personal Data Questionnaire."

## 2. ADMONISHMENT AS TO PUBLICITY (# 11)/ALLEGED MEDIA INCIDENT (# 46)

■ Appellant argues that the trial court violated RCr 9.70 and committed reversible error at the beginning of individual voir dire when, before dividing the prospective jurors into groups scheduled to return on later days for individual voir dire, it failed to admonish them not to read about the case. According to Appellant, on the second day of individual voir dire, a local newspaper, *The Pioneer News,* ran an editorial regarding the trial that addressed the additional security precautions involved. The individual voir dire examination revealed that a number of the prospective jurors had either read the article or overheard others talking about it. Appellant raised no objection at the times he claims the admonition should have been given, but moved the trial court for a mistrial and asked it to strike the jury panel when prospective jurors revealed during individual voir dire that they were aware of the article.

RCr 9.70 provides:

The jurors, whether permitted to separate or kept in charge of officers, must be admonished by the court that it is their duty not to permit anyone to speak to, or communicate with, them on any subject connected with the trial, and that all attempts to do so should be immediately reported by them to the court, and that they should not converse among themselves on any subject connected with the trial, nor form, nor express any opinion thereon, until the cause be finally submitted to them. This admonition must be given or referred to by the court at each adjournment.

Although trial courts have the discretion to admonish prospective jurors on these subjects early in the voir dire process, and we believe it would be the better practice to do so, we agree with the Commonwealth that RCr 9.70 requires this admonition only after the jury has been selected and sworn to try the case. The term "jurors" as utilized in RCr 9.70 refers to the members of a selected and sworn jury. *Compare* RCr 9.36(2) (referring to "prospective jurors" in context of challenges for cause); RCr 9.38 (referring to "prospective jurors" in context of voir dire examination). In fact, the Administrative Procedures of the Court of Justice (Ad.Proc.) Part II, § 31 require this admonition "[i]f *the jury* is permitted to separate[.]" (emphasis added). To the extent that *Schweinefuss v. Commonwealth,* Ky., 395 S.W.2d 370, 375 (1965), suggests that an RCr 9.70 admonishment is required at this stage of the proceedings, it is hereby overruled. Accordingly, we hold that the trial court was not required to give the RCr 9.70 admonishment to the prospective jurors at the conclusion of the first day of voir dire—or at any time before the jury was sworn—and the trial court thus properly denied Appellant's motion for a mistrial and to strike the jury panel, which were premised on the trial court's failure to give the admonishment.

■ In any event, we agree with the Commonwealth that, under the facts of this case, Appellant has the burden to show actual jury prejudice, *Byrd v. Commonwealth,* Ky., 825 S.W.2d 272, 274–75 (1992), and that Appellant has failed to demonstrate how he was prejudiced from either the trial court's failure to admonish the jury not to read about the case or the fact that certain jurors apparently were exposed to media coverage. The trial court, the prosecution, and defense counsel each conducted extensive individual voir dire in part to determine whether any

press accounts to which prospective jurors may have been exposed might influence their decisions in the case. In Part III(C)(4), *infra*, we address Appellant's arguments as to the jurors and prospective jurors whom Appellant asserts the trial court should have excused because of their exposure to pretrial publicity. With regard to Appellant's speculative allegation that "other prospective or actual jurors might have been exposed to the publicity but weren't discovered," we find no actual prejudice.

The trial court did not err when it denied Appellant's request to question an undefined number of deputy sheriffs under oath about an incident that involved a television news reporter who was speaking with a deputy sheriff in the presence of prospective jurors, which allegedly occurred during the first afternoon of individual voir dire. Appellant was allowed to voir dire each member of the jury as to whether they had read about the case in the newspaper, seen television news coverage about it, or overheard other people discussing it. We hold that this voir dire was a more-than-sufficient mechanism to ferret out prospective jurors whose impartiality may have been compromised by the publicity they encountered.

### 3. INDIVIDUAL VOIR DIRE (# 20 & 57)

Although Appellant raised no objection at the time of trial, he argues on appeal that the trial court violated his fundamental constitutional guarantees when it excused prospective jurors whose personal beliefs prevented them from imposing a sentence of death. This argument, which we see raised in virtually every capital case appealed to us, "has been consistently rejected" by the United States Supreme Court, *Hodge v. Commonwealth*, Ky., 17 S.W.3d 824, 838 (2000) (collecting cases), and by this Court, which has repeatedly and "consistently held [it] to be

without merit." *McKinney*, 60 S.W.3d at 512. It is a fully adequate response to Appellant's argument to state simply that: "[d]eath qualification of jurors is not unconstitutional." *Caudill v. Commonwealth*, 120 S.W.3d 635, 678 (2003).

Appellant also argues that the trial court erroneously limited the scope of individual voir dire examination. We find the scope of voir dire in this case constitutionally adequate. "The trial judge has broad discretion in the area of questioning on voir dire[,]" *Woodall v. Commonwealth*, Ky., 63 S.W.3d 104, 116 (2001) (citing *Ward v. Commonwealth*, Ky., 695 S.W.2d 404 (1985)), *cert. denied*, 537 U.S. 835, 123 S.Ct. 145, 154 L.Ed.2d 54 (2002), and, in particular, "[t]he extent of direct questioning by counsel during voir dire is a matter within the discretion of the trial court." *Furnish*, 95 S.W.3d at 44.

During individual voir dire, the trial court asked the following questions, with slight variations from time to time and "follow-up" questions as necessary, of each prospective juror:

If the Defendant is found guilty of Murder as charged and of certain aggravating circumstances the Commonwealth intends to seek the death penalty. However, there are a range of penalties the jury may consider. They include the death penalty, imprisonment for life without the benefit of parole for twenty-five years, imprisonment for life, and a term of imprisonment of not less than twenty years.

Would your personal beliefs prevent you from imposing any of those four punishments, if the court instructed you to consider then and if warranted by the evidence?

Would you automatically vote either for or against: Death? Life without the possibility of consideration of parole for at least 25 years? Life imprisonment?

A term of not less than 20 years in prison?

Mitigation is evidence about a person's character, background, or circumstances that may be considered as a reason for imposing a less severe punishment than otherwise would be imposed. A mitigating circumstance is the opposite of an aggravating circumstance, which may be a reason for imposing a more severe punishment than otherwise would be imposed.

Would you consider any evidence offered to you in mitigation of punishment, if instructed to do so by the court? Would you consider any evidence offered in aggravation of punishment, if instructed to do so by the court?

Have you read or heard anything about this case before today? Has anything you may have read or heard caused you to form an opinion concerning this case? Are you able and willing to disregard anything you may have read or heard, and decide this case solely on the evidence introduced during the trial?

Appellant submits a list of topics upon which he attempted to question prospective jurors but was prevented from doing so when the trial court sustained objections from the Commonwealth. We find that "the trial court properly curtailed questions that were not proper and only confused the panel." *Furnish*, 95 S.W.3d at 44. The trial court was well within its discretion to prohibit Appellant from repeating questions already posed by the trial court, *Woodall*, 63 S.W.3d at 118, inquiring generally how prospective jurors "felt about the death penalty," *Id.* at 117, what they considered a "proper case" for the death penalty, *Hodge*, 17 S.W.3d at 839, and whether they believed fewer "heinous crimes" would occur if the death penalty were employed more often. *Woodall*, 63 S.W.3d at 117. "The mere fact that

more detailed questioning might have somehow helped the accused in exercising peremptory challenges does not suffice to show abuse of the discretion in conducting the examination." *Id.* at 116. Here, "[b]oth parties were able to thoroughly voir dire the panel[,]" *Furnish*, 95 S.W.3d at 44, and we find no error in the trial court's rulings as to the scope of individual voir dire questioning.

### 4. *APPELLANT'S CHALLENGES FOR CAUSE (# 19)*

Appellant argues that erroneous rulings on his challenges for cause denied him the full use of his peremptory challenges. Appellant identifies ten (10) prospective jurors that he argues the trial court should have excused because of their alleged exposure to pretrial publicity or their inability to consider the full range of authorized punishments, mitigation evidence, or to focus their full attentions on the case. We have examined the transcript of general and individual voir dire, and considering the voir dire as a whole, we conclude that the trial court did not abuse its discretion in overruling Appellant's challenges for cause.

"The question of whether a juror should be excused for cause is a matter within the sound discretion of the trial court." *Thompson v. Commonwealth*, Ky., 862 S.W.2d 871, 874 (1993). And, because the trial court occupies a superior position to evaluate whether, in light of "all of the evidence, the prospective juror can conform his views to the requirements of the law and render a fair and impartial verdict," *Mabe v. Commonwealth*, Ky., 884 S.W.2d 668, 671 (1994), a trial court's rulings on challenges for cause "will not be reversed on appeal unless ... clearly erroneous." *Foley v. Commonwealth*, Ky., 953 S.W.2d 924, 932 (1997). *See also Stopher v. Commonwealth*, Ky., 57 S.W.3d 787, 797

(2001) ("Giving due deference to the opportunity of the trial court to observe the demeanor of the prospective jurors and understand the substance of their answers to voir dire questions .... "), *cert. denied,* 535 U.S. 1059, 122 S.Ct. 1921, 152 L.Ed.2d 829 (2002); *Mabe,* 884 S.W.2d at 671. From our review of the record, we find no abuse of discretion in the trial court's rulings. "The record here demonstrates a thorough voir dire examination by the court and counsel and carefully considered rulings on appellant's challenges for cause.... [W]e find no error in the court's rulings." *Id.*

## 5. ALLOCATION OF PEREMPTORY CHALLENGES (# 45)

 Appellant's contention that the Kentucky Rules of Criminal Procedure entitled him to one (1) more peremptory challenge than the Commonwealth received is simply incorrect. Because Appellant was the only defendant at trial and the trial court seated alternate jurors, the trial court properly permitted Appellant and the Commonwealth to exercise nine (9) peremptory challenges each. RCr 9.40; *Furnish,* 95 S.W.3d at 45–46; *Stopher,* 57 S.W.3d at 798. The trial court did not abuse its discretion when it declined Appellant's request for "bonus" challenges and allocated peremptory challenges in accordance with RCr 9.40. *Furnish,* 95 S.W.3d at 46; *Stopher,* 57 S.W.3d at 798.

## D. EVIDENTIARY, TRIAL PROCEDURE, AND JURY MANAGEMENT ISSUES

### 1. OTHER BAD ACTS EVIDENCE (# 1)

 Appellant complains that much of the Commonwealth's evidence at trial was inadmissible evidence of bad character that demonstrated nothing more than Appellant's propensity towards criminal activity. Appellant primarily focuses upon the testimony as to his jail escape, burglary, and vehicle theft in Oklahoma and the ensuing manhunt, a kidnapping and vehicle theft in Colorado and a murder in New Mexico, and the shooting incident involving Trooper Bennett. We hold that no reversible error occurred from the introduction of any of the evidence identified in Appellant's brief.

 On appeal, the applicable standard of review is whether the trial court was clearly erroneous in its factual findings that permitted the Commonwealth to introduce the evidence. KRE 104(a). *Cf. Parker v. Commonwealth,* Ky., 952 S.W.2d 209 (1997). Here, the trial court properly permitted the Commonwealth to introduce evidence of Appellant's prior crimes and bad acts that were part of a continuous course of conduct in the form of a "crime spree" that began with Appellant's escape from an Oklahoma jail and ended with his flight from Trooper Bennett. KRE 404(b) provides:

> *Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible:
>
> (1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or
>
> (2) If so inextricably intertwined with other evidence essential to the case that separation of the two could not be accomplished without serious adverse effect on the offering party.

The trial court correctly ruled that testimony as to Appellant's criminal conduct in Oklahoma, Colorado, and New Mexico prior to his Murder of Brady as well as his post-murder shooting at and flight from Trooper Bennett was relevant and admis-

sible under both KRS 404(b)(1) & (2). "[I]dentification of the defendant as the perpetrator of the crime charged is an essential element in any criminal prosecution." *Sanders v. Commonwealth*, Ky., 801 S.W.2d 665, 674 (1990). In this case, the evidence concerning Appellant's crime spree, among other things: (1) proved how Appellant came into possession of the murder weapon, *see Stanford v. Commonwealth*, Ky., 793 S.W.2d 112, 116 (1990) ("Appellant's theft of the gun used to commit the crimes charged and theft of the automobile to transport the victim to the point of the murder are so interwoven with the Commonwealth's proof as to render this evidence admissible despite the fact that it tended to prove collateral uncharged criminal conduct."); (2) demonstrated a motive for his abduction of Brady by illustrating Appellant's penchant for late-model small pickup trucks; (3) linked the items found in Brady's abandoned truck to Appellant; and (4) suggested similarities between the execution-style killings of Keeling in New Mexico and Brady in Kentucky that created a reasonable inference that Appellant had committed both murders. *See Sanders*, 801 S.W.2d at 674 ("The record discloses a remarkable similarity between the respective crimes[.]") As such, "[i]t is difficult to ignore that after his escape ... appellant went on a crime spree and along the way murdered two victims. We have found no basis to disturb the trial court's rulings on the admission of the challenged evidence." *Haight v. Commonwealth*, Ky., 938 S.W.2d 243, 252 (1996). Nor do we agree with Appellant's contention that the Commonwealth committed "overkill" by presenting this other bad acts evidence in excess detail. "If evidence of other crimes is admissible to show intent or identity or a common scheme or plan, the jury must weigh such evidence for what it is worth[.]" *Sanders*, 801 S.W.2d at 675 (1990).

## 2. *STEPHENS'S FORMER TESTIMONY (# 2)*

■ Although we agree with Appellant's contention that the trial court erred when it permitted the Commonwealth to introduce a transcript of Stephens's testimony in a March 1992 preliminary hearing as to escape charges brought in Oklahoma against Appellant and Reese, we find the error harmless in this case because Appellant himself testified at trial to the same significant facts. At that preliminary hearing, Stephens testified that, on September 20, 1991:(1) he was "laying there on the couch, watching the Michael Landon story on T.V." when he "got up to turn the stove down and [Appellant] just come in right on top of me and knocked me flat in the floor"; (2) Appellant then took a .357 Ruger off the end of the couch and held Stephens and his mother at gunpoint and "[t]old me that if he had to he would blow my head off. That he didn't want to hurt me, but he would"; (3) Appellant held the handgun pointed "[r]ight square in my face" and "cocked the hammer on it several times"; and (4) Reese and Appellant subsequently took the keys to a pickup truck from Stephens's mother and left in the pickup—with Reese driving and Appellant on the passenger side.

The record reflects that Stephens died before Appellant's case came to trial, and it is thus likely that his prior sworn testimony would be admissible under the "former testimony" exception to the hearsay rule, KRE 804(b)(1). We need not address that question, however, because Appellant's crime was committed prior to the July 1, 1992 effective date of the Kentucky Rules of Evidence, and the transcript was thus not admissible at Appellant's trial unless it "would have been admissible under evidence principles in existence prior to the adoption of [the Kentucky Rules of Evidence]" KRE 107(b). *See also Hodge*, 17 S.W.3d at 842. And, under pre-KRE

law, former testimony was not admissible at a criminal trial unless the testimony was given at "a previous trial of the same offense ... on the same charge[.]" RCr 7.22. *See also Commonwealth v. Bugg,* Ky., 514 S.W.2d 119, 121 (1974); *Commonwealth v. Howard,* Ky.App., 665 S.W.2d 320, 323 (1984). Accordingly, the trial court erred when it permitted the Commonwealth to introduce the transcript.

▬ To support his claim that he was prejudiced by the introduction of Stephens's former testimony, Appellant references the Commonwealth's trial court description of it as "obviously a critical and key item of evidence in this matter." We find it clear from the context of the Commonwealth's statement that it believed the evidence to be significant because it placed the murder weapon in Appellant's hands. From our review of the record, however, we conclude that, regardless of whether the Commonwealth believed that the transcript was critical evidence at some point in the proceedings, the transcript became far less critical, if not insignificant, after Appellant himself took the stand and admitted that he had taken the handgun from Stephens's home. While Appellant described himself as somewhat of a reluctant participant in the events, he admitted that he had pushed Stephens down, grabbed the handgun, threatened Stephens with it, and left with it in his possession, and he further admitted that the testimony of Reese and Stephens to those same facts was accurate. In fact, Appellant's trial counsel had conceded as much during his opening statement in stating: "There are some other facts that there is no dispute about.... They went to Texas together after stealing some items from a man named Stephens. From that point on there is going to be plenty of dispute." And the defense's culpability-phase closing argument closes the door on Appellant's suggestion that there was a substantial dispute at trial as to what had occurred at Stephens's home:

> We heard about the Stephens' house. No question Michael St. Clair and Dennis Reese burglarized that house. Broke in on Mr. Stephens and his mother. No question. No question Michael grabbed the gun and held Mr. Stephens at gun point.
>
> No question that they left out of there with a .357 Ruger and a green pickup truck that belonged to the Stephens[.]

It is worthy of note that the only reference to Stephens's former testimony in the Commonwealth's culpability-phase summation concerned Appellant's possession of Stephens's handgun and the Commonwealth's argument further demonstrates the complete lack of factual dispute on that question:

> Let's look at the gun. Dennis Reese said the gun was in St. Clair's hand at the moment of the burglary; .357 Ruger Black Hawk. Vernon Stephens said that. Why Michael St. Clair even said that.

Although Appellant's account of the events was not identical to Stephens's former testimony, the men agreed on the significant facts—*e.g.,* that Appellant left in a pickup truck with Stephens's .357 Ruger Black Hawk handgun. In contrast, the differences in their accounts were minor and inconsequential. In his brief, Appellant fails to mention his own testimony regarding the crimes he committed at Stephens's home, and Appellant thus offers no indication of how he was prejudiced by the erroneous introduction of Stephens's former testimony. We discern no prejudice and find the error harmless. RCr 9.24.

### 3. *TELEPHONE RECORDS (# 12)*

▬ The trial court ruled that the Commonwealth could introduce Exhibits 37–A and 37–B (an enlargement of Exhibit 37–A), which were computer printouts

from telecommunications provider General Telephone Company ("GTE") that showed eleven (11) telephone calls made from a payphone at the Glendale Truck Stop in Glendale, Kentucky to Appellant's friends and family in Oklahoma. Special Agent Robert Chatham of the Security Services Division of GTE, testified that in order to determine call volume and to track income at coin-operated telephones GTE maintains computer records on calls made from pay telephones in its regular course of business from which "we can . . . specify what information we want and extract it in a more timely manner." Exhibits 37–A and 37–B represented "an assist run from our local switch in the Elizabethtown office denoting long distance telephone calls to Oklahoma." Special Agent Chatham testified that he was the official custodian of records for GTE and explained that although the exhibits themselves were generated in response to a subpoena from the Commonwealth of Kentucky, "all of the call information on here would have been available in one report or in one form or another within GTE."

KRE 803(6) provides:

The following are not excluded by the hearsay rules, even though the declarant is available as a witness:

. . . .

(6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness . . . .

Appellant argues that the exhibits were not admissible as business records because the exhibits themselves were not prepared in the regular course of GTE's business but were instead prepared in response to a subpoena. Accordingly, Appellant maintains that the fact that the exhibits were prepared "in anticipation of litigation" demonstrates that "the method or circumstance of preparation indicate lack of trustworthiness." However, "[t]his argument misconstrues the essence of Rule 803(6): so long as the original computer data compilation was prepared pursuant to a business duty in accordance with regular business practice, the fact that the hard copy offered as evidence was printed for purposes of litigation does not affect its admissibility." *United States v. Hernandez*, 913 F.2d 1506, 1512–1513 (10th Cir.1990). *See also United States v. Fujii*, 301 F.3d 535, 539 (7th Cir.2002) (airline check-in and reservation records compiled and presented in computer printouts prepared specifically for trial were admissible under FRE 803(6) because underlying records were compiled and maintained in ordinary course of business). Accordingly, the trial court did not abuse its discretion when it permitted the Commonwealth to introduce exhibits 37–A and 37–B.

### 4. *VAN ZANDT'S DEPOSITION TESTIMONY (# 13, 21, 22, & 28)*

Five (5) days before trial, the Commonwealth moved the trial court to allow it to take the deposition of Appellant's ex-wife, Bylynn Van Zandt, for use at trial. According to the Commonwealth, Ms. Van Zandt, a resident of Oklahoma, was unable to travel to Kentucky for the trial because of complications with her pregnancy. Over Appellant's objection, the trial court granted the Commonwealth's motion, and counsel for both the Commonwealth and Appellant traveled to Oklahoma and took Ms. Van Zandt's deposition via video. Ms. Van Zandt testified that she had met up

with Appellant and Reese in Texas shortly after their escape and had brought Appellant money and certain items—handcuffs, music tapes, and clothing. The Commonwealth used Ms. Van Zandt's testimony to link Appellant to the items found in Brady's pickup truck and thereby discredit Appellant's defense that he was not in Kentucky. At trial, the video was played twice for the jury—once during the Commonwealth's case-in-chief and again during the jury deliberations at the jury's request. Appellant raises a series of arguments with respect to Ms. Van Zandt's testimony, specifically: (a) the trial court erred by allowing the Commonwealth to introduce the video deposition without proving that Ms. Van Zandt was constitutionally unavailable to testify; (b) the Commonwealth's discovery violations in connection with Ms. Van Zandt's video deposition warrant a new trial; and (c) the trial court erred when it replayed Ms. Van Zandt's testimony during the jury's deliberations, but allegedly discouraged the jury from rehearing other witnesses' testimony. We find none of Appellant's arguments persuasive and we find no error in the trial court's rulings.

▮▮▮▮ As to Appellant's first argument, we observe that RCr 7.20(1) permits the introduction of deposition testimony at a criminal trial under certain circumstances:

> At the trial or upon any hearing, a part or all of a deposition, so far as otherwise admissible under the rules of evidence, may be used if it appears: that the witness is dead; or that the witness is out of the Commonwealth of Kentucky, unless it appears that the absence of the witness was procured by the party offering the deposition; or that the witness is unable to attend or testify because of sickness or infirmity, or that the party offering the deposition had

been unable to procure the attendance of the witness by subpoena. . . .

While RCr 7.20(1) permits the introduction of deposition testimony "if it appears . . . that the witness is out of the Commonwealth of Kentucky," the United States Supreme Court held in *Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968), that a witness's mere absence from the jurisdiction does not make that witness "unavailable" for trial. *Id.*, 390 U.S. at 723, 88 S.Ct. at 1321, 20 L.Ed.2d at 259. Consequently, "[r]eliance upon [RCr 7.20(1)] . . . is not conclusive when a defendant claims a denial of his Sixth Amendment right of confrontation." *Lovett v. Commonwealth*, Ky., 103 S.W.3d 72, 82 (2003). *See also id.* at 84. "In short, a witness is not 'unavailable' for purposes of . . . the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." *Barber*, 390 U.S. at 724–5, 88 S.Ct. at 1321–22, 20 L.Ed.2d at 260. This constitutional dimension of witness unavailability is reflected in the Kentucky Rules of Evidence. *See* Robert G. Lawson, *The Kentucky Evidence Law Handbook*, § 8.45(IV) at 433 (3d ed. Michie 1993) ("A showing that would meet the requirements of [KRE 804] would simultaneously satisfy the constitutional dictates of the Confrontation Clause.")

The Commonwealth argues that Ms. Van Zandt was unavailable to testify in person at Appellant's trial because of complications associated with her pregnancy at the time. KRE 804(a)(4) provides: " 'Unavailability as a witness' includes situations in which the declarant—(4) is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity[.]" At a hearing on the Commonwealth's motion seeking the trial court's authorization to take Ms. Van Zandt's deposition for presentation at trial, the Commonwealth explained that Ms. Van

Zandt's attorney had contacted them regarding his client's medical condition and that Ms. Van Zandt's physician subsequently faxed "a letter showing that she's not able—medically able to travel." The record reflects that the Commonwealth handed the physician's letter to Appellant's trial counsel. In a subsequent pleading, the Commonwealth explained that:

> [T]he witness is unable to travel to Kentucky for medical reasons. During the 2:30 p.m. August 13, 1998 telephone conference call, the Commonwealth stated that the information precipitating the request for a deposition had been received that same day. The Commonwealth had been informed that the witness is approximately 5 ½ months pregnant. She was reported to have been hospitalized that day for surgery associated with her pregnancy and, for the duration of trial, she is under a doctor's order not to travel.... The accuracy of this reported information can be explored during the deposition itself.

The trial court's findings in its written order for Appellant's transport to the deposition in Oklahoma reflect that the trial court accepted the Commonwealth's proof as to Van Zandt's unavailability: "it further appearing that it is necessary due to the medical condition of an essential witness to take the out of state deposition of said witness, Bylynn Van Zandt, and it further appearing that to adequately protect the defendant Michael Dale St. Clair's Sixth Amendment right of confrontation his appearance at that deposition is necessary ...."

 Appellant argues that the failure of the Commonwealth to produce any sworn testimony as to Van Zandt's unavailability to testify at trial made the introduction of her deposition improper. It is black-letter law that "[t]he ultimate question is whether the witness was unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness [and] ... the prosecution bears the burden of establishing that predicate," *Ohio v. Roberts*, 448 U.S. 56, 74–5, 100 S.Ct. 2531, 2543–44, 65 L.Ed.2d 597, 613 (1980). *Cf. Justice v. Commonwealth*, Ky., 987 S.W.2d 306, 313 (1998) ("put[ting] the onus" on the party offering evidence under KRE 804(b) to show that the witness was unavailable). However, the KRE 104(a) & (b) preliminary determination of "[w]hether a witness is 'unavailable,' ... is a matter committed to the sound discretion of the trial judge whose decision will not be reversed unless it is clearly unreasonable." *Lovett*, 103 S.W.3d at 83. *See also Brooks v. Commonwealth*, Ky., 114 S.W.3d 818, 821–22 (2003). And, the trial judge has the "discretion to determine the sufficiency of the showing which would justify the reading of an absent witness'[s] testimony[.]" *Bruce v. Commonwealth*, Ky., 441 S.W.2d 435, 437 (1969). Although the Commonwealth could have made a much cleaner record in this regard by tendering the letter from Ms. Van Zandt's physician to the court, filing with the Court an affidavit from either the physician or the prosecutor himself, *see Brooks*, 114 S.W.3d at 821, or questioning Ms. Van Zandt as to her physician's orders during the video deposition, the trial court did not abuse its discretion in finding Ms. Van Zandt unavailable on the basis of the Commonwealth's assurances. *See Ruppee v. Commonwealth*, Ky., 821 S.W.2d 484, 486 (1991); *Bruce*, 441 S.W.2d at 437.

 Appellant raises three (3) allegations of error concerning alleged discovery violations in connection with Ms. Van Zandt's testimony. As to the first, we agree with Appellant that the trial court should have sustained Appellant's objection to Ms. Van Zandt's testimony that Appellant had told her "about breaking into this old man's house" because the

Commonwealth had not complied with RCr 7.24(1) by disclosing the substance of this "oral incriminating statement known by the attorney for the Commonwealth to have been made by" Appellant to Ms. Van Zandt. For the reasons outlined above in Part III(D)(2), however, Appellant's own subsequent testimony as to his crimes at Stephens's home makes the error harmless. We find Appellant's other arguments, which allege that the Commonwealth failed to disclose exculpatory evidence, unpersuasive.

 Prior to the video deposition and outside the presence of Appellant and his counsel, the Commonwealth asked Ms. Van Zandt to identify the clothing found in Brady's vehicle, and Ms. Van Zandt told the prosecution that the blue jeans and army jacket were not the clothes she had brought to her husband when she met him in Texas. Appellant asserts that the Commonwealth's failure to disclose this allegedly exculpatory evidence to the defense in a timely fashion, *i.e.*, prior to or during the video deposition when Appellant's trial counsel would have an opportunity to preserve testimony to that effect for presentation at trial, violated the Commonwealth's duties as established in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In *Brady*, the United States Supreme Court held "that the suppression of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.*, 373 U.S. at 87, 83 S.Ct. at 1196–97, 10 L.Ed.2d at 218. It is fundamental, however, that the materiality of a failure to disclose favorable evidence "must be evaluated in the context of the entire record." *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). And the mere possibility that an item of undisclosed information might have helped the defense, or might have affected the out-

come does not establish materiality in the constitutional sense. *Id.*, 427 U.S. at 112 n. 20, 96 S.Ct. at 2401–02, 49 L.Ed.2d at 354 n. 20. Because we find no reasonable probability that Ms. Van Zandt's statement as to the clothing found in Brady's pickup would have changed the verdict in this case if disclosed to the defense and introduced at trial, we find no *Brady* violation in the Commonwealth's failure to disclose it.

 Because there is no evidence whatsoever that the Commonwealth gave or promised Ms. Van Zandt anything in exchange for her testimony, we find no merit in Appellant's contention that the Commonwealth violated its *Brady* duties by failing to disclose an agreement, deal, or understanding that, from all indications, did not exist. Appellant's trial counsel vigorously cross-examined Ms. Van Zandt as to her motivations for testifying and her concerns that she could be charged as a co-conspirator for assisting Appellant after his escape.

 As to Appellant's final allegation of error concerning Ms. Van Zandt's testimony, we observe that "[a]ny decision to allow the jury to have testimony replayed during its deliberations is within the sound discretion of the trial judge." *Baze v. Commonwealth*, Ky., 965 S.W.2d 817, 825 (1997). The trial judge in this case did not abuse that discretion when it replayed Ms. Van Zandt's videotaped deposition over Appellant's objection that doing so would "improperly highlight" her testimony. Both times the videotaped deposition was played, the trial court admonished the jury to "give the witness the same credence ... that you would give her if she were here to testify in person." We disagree with Appellant's contention that the trial court, in its response to a juror's inquiry whether it was possible "to review transcripts of the witness' [sic] testimony

... back in the jury room," limited or chilled the jurors' ability to request that additional testimony be read back to them. The trial court correctly answered "[y]ou cannot review transcripts back in the jury room." *see* RCr 9.74, and explained "[i]f you want a particular witness' [sic] testimony read back to you by the reporter the Court will consider that request." Given that the trial court had the discretion as to whether and to what extent trial testimony would be re-read at the jury's request, the court's additional commentary—"[b]earing in mind that we don't want to read back the whole trial that's been going on for three weeks"—did not deprive Appellant of due process.

### 5. *ISSUES AS TO CO-INDICTEE REESE (# 14, 15, 21, 24, 33, 34, 35, 38, & 47)*

Reese testified for the better part of two (2) days during the Commonwealth's case-in-chief as to the events beginning with his escape with Appellant from jail in Durant, Oklahoma and continuing through Brady's kidnapping and murder. The Commonwealth's theory of the case was premised largely upon Reese's testimony, which fingered Appellant as the person who killed Brady. As a result, Appellant raises several allegations of error that address the trial court's rulings on matters relevant to Reese's testimony and Appellant's ability to impeach and otherwise discredit that testimony. We find no grounds for reversal in any of Appellant's allegations.

Appellant sought to attack Reese's credibility with evidence that he suffered from Dissociative Identity Disorder (DID)—a condition that the defense argued prevented Reese from having the ability to accurately recall and relate events and would lead him to confabulate events. After he learned that Reese had been previously diagnosed with DID by a Dr. Joann Ondrovik, who examined Reese in 1993 in connection with a criminal prosecution for murder in Oklahoma, Appellant sought an order "directing that [Reese] be subjected to a comprehensive forensic mental health evaluation, with particular focus on the diagnosis of Dissociative Identity Disorder (DID), by a professional who is specially qualified in the field, prior to testifying against the accused herein[.]" The trial court denied Appellant's motion, but stated that it would reconsider its ruling "[i]f information is obtained that the defendant feels would be appropriate to bring this motion in the future." Appellant subsequently unsuccessfully moved the trial court to reconsider the prior ruling, but Appellant submitted no additional relevant information at that time for the court's consideration. Appellant argues on appeal that the trial court should have ordered the examination he sought pursuant to CR 35.01 as well as principles of due process and fundamental fairness. We find no error.

CR 35.01, which is applicable to criminal proceedings by virtue of RCr 13.04, provides:

> When the mental ... condition of *a party, or of a person in the custody or under the legal control of a party,* is in controversy, the court in which the action is pending may order the party to submit to a ... mental examination by a physician ... or appropriate health care expert, or to produce for examination the person in his custody or legal control. (Emphasis added)

Although Reese was Appellant's co-indictee, he plead guilty three (3) years before Appellant's case came to trial and thus was not a "party" to the action at the time of Appellant's motion. Appellant provides no warrant for his assertion that Reese was "in the custody or under the legal control of" a party, namely the Commonwealth. To the contrary, Reese's trial testimony demonstrated that his permanent home

was the Oklahoma State Prison. It thus appears that Reese was "on loan" from Oklahoma in order to testify at Appellant's trial, but was not "in the custody or under the legal control of" a party within the contemplation of CR 35.01. Accordingly, "CR 35.01 provides no basis for … an independent examination." *Bart v. Commonwealth*, Ky., 951 S.W.2d 576, 578 (1997).

 While we recognize that this Court has held that "due process and fundamental fairness may, *depending on the circumstances*, entitle the defendant to have the alleged victim examined by an independent expert," *Mack v. Commonwealth*, Ky., 860 S.W.2d 275, 277 (1993) (emphasis added), "the critical question is whether the evidence sought by the appellant is of such importance to his defense that it outweighs the potential for harm." *Turner v. Commonwealth*, Ky., 767 S.W.2d 557, 559 (1988). And, "[w]e must be vigilant not to open the door to the opportunity for a defendant in a criminal case to invade the privacy … or to harass the witness." *Id.* at 559. In this case, Dr. Ondrovik testified for the defense at trial regarding her diagnosis of Reese, and Appellant was able to present this evidence to the jury notwithstanding the trial court's denial of his motion for an evaluation, which effectively denied Appellant only a more recent diagnosis to present to the jury. The trial court appropriately denied Appellant's request for additional psychological testing because Appellant failed to demonstrate that the evidence sought was sufficiently important to outweigh the potential for harm.

 In a related allegation of error, Appellant argues that the trial court improperly denied his motion for an order that would have required the Commonwealth to provide Appellant with "copies of any and all mental health records concerning … Reese, in the custody and control

of any agent of the Commonwealth of Kentucky, or of the State of Oklahoma, or known by either such agency to exist, or in the custody and control of any current or former agent of, or attorney or mental health professional employed by or on behalf of, Dennis Reese[.]" We observe that *Eldred v. Commonwealth*, Ky., 906 S.W.2d 694 (1994), defined the Commonwealth's obligations with respect to mental health records much more narrowly: "[t]he Commonwealth's obligation includes records actually in the hands of the prosecutor, its investigator, and other agencies of the state." *Id.* at 702 (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 58–59, 107 S.Ct. 989, 1001–02, 94 L.Ed.2d 40, 58 (1987)). Significantly, when his motion was heard by the trial court, Appellant's trial counsel conceded that the Commonwealth was not required to serve as Appellant's investigator:

The Commonwealth's position appears to be that they don't have any obligation to obtain this stuff that is not in their possession, we can obtain it by subpoena. And that's okay. We will proceed to get subpoenas and obtain those records as best we can so long as the Commonwealth asserts that it has complied or turned over to us every record which is in its control, which is within the control of its agents, or which it has knowledge of and the ability to obtain control over.

And so long as the Commonwealth is aware of its obligation … and asserts that it is complying with that, that's okay. As far as the remainder of the record, we will obtain them by subpoena with the Court's cooperation.

After the Commonwealth explained that it had "turned over the one and only report that had come into our possession," the trial court denied Appellant's motion to require the Commonwealth to accumulate

Reese's mental health records, but expressly permitted Appellant to subpoena the records himself. And it is clear from the record in this case that the trial court subsequently issued a subpoena duces tecum for Dr. Ondrovik to provide records upon which she based her diagnosis and that Appellant received additional psychological records as a result. Appellant's brief identifies no coherent claim of error.

■ Shortly before Dr. Ondrovik testified at trial, she learned that her mother had just suffered a stroke. During Appellant's direct examination of her, he first solicited testimony concerning her name, address, occupation, and employment. Then Appellant's trial counsel asked: "Doctor, before we go any further, I just want to let the jury know if you appear nervous or upset, it is not about testifying here, is it?" Simultaneously, Dr. Ondrovik replied "no, my," and the Commonwealth objected. The trial court sustained the objection. Appellant argues that the trial court's ruling prevented him from communicating to the jury that the trial proceedings were running later than usual that day because Dr. Ondrovik needed "to get on her way" because of a family emergency and thereby abridged his right to present a defense, "denied him due process of law, a fair trial, and reliable capital sentencing." We find no merit to this assertion. The trial court correctly sniffed this out as an attempt to introduce evidence that, while clearly irrelevant, could engender sympathy for the witness. The trial court thus properly sustained the Commonwealth's objection.

■ Even if the trial court had the discretion to prohibit attorneys from communicating with their witnesses during mid-testimony recesses, *compare Perry v. Leeke,* 488 U.S. 272, 283–4, 109 S.Ct. 594, 601–2, 102 L.Ed.2d 624, 635 (1989) ("[T]he judge must also have the power to maintain the status quo during a brief recess in

which there is a virtual certainty that any conversation between the witness and the lawyer would relate to the ongoing testimony") *with Reams v. Stutler,* Ky., 642 S.W.2d 586, 589 (1982) (characterizing a trial court's admonition "that prohibited counsel from conferring with his own witness ... when a recess was called" as an "abuse of discretion"), it did not abuse that discretion when it denied Appellant's motion for an order prohibiting the Commonwealth from communicating with Reese during any trial recesses that occurred in the course of his testimony.

■ Although it is ordinarily improper for the Commonwealth to show during its case-in-chief that a co-indictee has already been convicted under the indictment, *see Tipton v. Commonwealth,* Ky., 640 S.W.2d 818, 820 (1982); *Parido v. Commonwealth,* Ky., 547 S.W.2d 125, 127 (1977), we find no reversible error in Appellant's unpreserved and improperly-preserved claims regarding the Commonwealth's introduction of such evidence in this case. Appellant's trial counsel's opening statement included the following:

> Another fact: Dennis Reese was present and played a role in Frank Brady's murder. You'll hear a lot of different versions most of them coming from Dennis Reese as to what role he played. But the fact is he was there. He played a role in it. And he has confessed before this Court to the murder of Frank Brady.
>
> . . .
>
> Dennis Reese, I will remind you again, the man who stood in this very courtroom in front of this very judge and confessed and pleaded guilty to the murder of Frank Brady.

The very first question asked during the defense's cross-examination of Reese zeroed-in on the fact that Reese had entered a negotiated plea of guilty, and subsequent

cross-examination demonstrated to the jury that, by pleading guilty to the Kentucky charges, Reese had avoided the death penalty without really "losing anything," because he was already facing consecutive sentences in Oklahoma of life without possibility of parole and one-hundred sixty (160) years. Appellant, of course, raised no objection to the Commonwealth's similar questioning during its direct examination of Reese, and it is apparent that the holdings of *Tipton* and *Parido* are inapplicable here because this case illustrates the "exception to the rule . . . when the defendant permits the introduction of such evidence without objection for the purpose of trial strategy." *Tamme v. Commonwealth*, Ky., 973 S.W.2d 13, 33 (1998). "Having employed that strategy, Appellant cannot be heard to complain after the strategy failed." *Id.* We additionally hold that the Commonwealth's introduction, through the Bullitt Circuit Court Clerk, of portions of Reese's plea colloquy was permissible in this case to rebut the defense's opening statement characterization of that plea as a "confession to the murder of Frank Brady," which created an inference that Reese had stated during his plea that he had personally shot and killed Brady. *Cf. Commonwealth v. Gaines*, Ky., 13 S.W.3d 923, 924 (2000) (defense opened door to testimony about co-defendant's plea during its cross-examination of co-defendant).

 In its opening statement, the Commonwealth informed the jury that it would "hear what Michael St. Clair said to Dennis Reese" about murdering Keeling, the man who Appellant killed in New Mexico after abducting him and stealing his pickup truck in Colorado. Reese testified that he remembered that the murder took place in New Mexico approximately seven (7) miles before they reached the Texas border because Appellant made a statement to the effect that "they enforce the death penalty in Texas." According to

Reese, after Appellant killed Keeling, he then "went through [Keeling's] wallet and tore the picture up of his little girl and thr[ew] it out the window." Appellant objected to these portions of Reese's testimony on the grounds that the Commonwealth had failed to comply with its RCr 7.24(1) discovery obligation by failing to disclose the substance of this testimony, which he alleges involved Appellant's "oral incriminating statements." The trial court sustained Appellant objection to his "they enforce the death penalty in Texas" statement and ordered it stricken from the record. Although Appellant alleges that the introduction of this evidence necessitated a mistrial, the record does not demonstrate "a manifest necessity . . . or an urgent or real necessity," *Skaggs v. Commonwealth*, Ky., 694 S.W.2d 672, 678 (1985), for a mistrial, and the trial court therefore did not abuse its discretion when it denied Appellant's motion. *Jones v. Commonwealth*, Ky.App., 662 S.W.2d 483, 484 (1983) ("[W]e must rely on the good sense of the trial court in not declaring a mistrial[.]"). Because Reese's testimony concerning Appellant's destruction of Keeling's child's picture did not involve any "statement" by Appellant, the Commonwealth had no obligation under RCr 7.24(1) to inform Appellant of it, and the trial court correctly overruled Appellant's objection, which was premised exclusively on an alleged breach of RCr 7.24(1).

 Appellant is correct that the trial court erroneously overruled his hearsay objection to Reese's testimony that he had spoken with Kincaid, *see infra* Part III(D)(6), regarding Kincaid's testimony and that "[h]e [Kincaid] told me [Reese] what Michael had told him at one point and I—asked me if it was true and I told him yes and I told him he should write -." Given that Kincaid subsequently testified to "what Michael had told him," and

Reese's testimony made it abundantly clear that, from his perspective, Kincaid's account, which identified Appellant as Brady's murderer, was "true," the error was harmless in this case. *See Garland,* 127 S.W.3d at 540.

Appellant's final allegation of error in connection with Reese's testimony involves issues of privilege and waiver, and this allegation requires a more extensive factual explanation than some of the prior allegations. In its attempts to impeach Reese's credibility as a witness, the defense: (1) argued that Reese had utilized discovery materials that were provided to him to "fill in the gaps" and to supply details in his testimony that were consistent with the Commonwealth's other evidence; and (2) suggested that Reese had a motive to lie because he had agreed to testify against Appellant in exchange for the plea agreement that spared his life. During its direct examination of Reese, the Commonwealth sought to rebut these claims:

Comm.: I want to make this clear. At any time when I have spoken to you—when any representative of the Commonwealth has spoken to you, have they ever handed you your statements and told you to keep them?

Reese: No, sir.

Comm.: Have they ever let you read your statements?

Reese: No, sir.

Comm.: Have they ever let you listen to tape recordings that you may have made?

Reese: No, sir.

. . .

Comm.: Are you expecting any benefit or has it been suggested to you from anybody that you would receive a benefit for testifying here today?

Reese: No, sir.

Comm.: Did you ever sign an agreement that you would testify?

Reese: No, sir.

During its cross-examination of Reese, Appellant's trial counsel explored Reese's expectations at the time of his plea as to whether he would be asked to testify against Appellant:

Defense: Now, when you were back here and entered your guilty plea you sort of expected this day would come, didn't you?

Reese: Yes, sir.

Defense: All right. You knew when you entered that plea that if Michael St. Clair ever went to trial here you would be called to testify against him.

Reese: I suspected that.

Defense: You talked about it?

Reese: I don't remember talking about it.

Defense: You don't remember talking to your attorneys about it?

Reese: We may have.

Defense: Did it seem important?

Reese: I was concerned about the plea bargain that I was signing.

Defense: My question is: Do you remember any discussion about whether or not you're going to have to testify against Michael St. Clair if he went to trial as he is now?

Reese: Yes, sir.

Defense: You do remember that?

Reese: Yes, sir.

Defense: And the answer was if they called you, you would have to come testify. Right?

Reese: If I didn't have no appeal pending.

To provide further evidence relevant to these topics of impeachment, Appellant in-

formed the trial court of its intention to call Rebecca Murrell, an attorney who represented Reese on his Kentucky charges, to testify as to "whether she recalls providing him with copies of his discovery" and "whether the likelihood of his being required to testify against St. Clair if he entered that plea was in fact something that was discussed between them." At a bench conference, Murrell explained that Appellant's trial counsel had informed her of the questions he intended to ask her, that she had discussed this with Reese, and that Reese had told her "he does not wish to waive the attorney[-]client privilege" and "does not wish either myself or [co-counsel] Ms. Schmidt as his counsel in connection with this case, to testify concerning any matters pursuant to client communication." Appellant argued that: (1) the attorney-client privilege was not relevant to Appellant's proposed question as to whether Reese's attorney had provided him with discovery materials; and (2) by testifying himself about discussions concerning whether his plea agreement would require him to testify, Reese had waived his attorney-client privilege with respect to any confidential communications concerning that topic. The trial court ruled that it would not require Murrell to answer the questions that Appellant's trial counsel had identified, but would permit Appellant to ask "whether or not it was [Murrell's] usual and customary practice to furnish items of discovery furnished to her by the Commonwealth to her clients."

Appellant called Murrell as a witness and, after establishing that she had represented Reese in her capacity as public defender, asked:

Defense: Ms. Murrell, tell the jury what is meant by discovery in a criminal law context?

Murrell: In laymen's terms discovery would be that process by which a defendant, through counsel, is furnished with information relating to the case, it is a process that is governed by applicable rules and statutory provisions.

Defense: Do those rules provide that if the prosecution is in possession of a statement, whether written or taped, that they must provide it to you in discovery?

Murrell: Yes, sir.

Defense: Do those rules provide that other items of evidence, reports, photographs, so on, are provided to you in discovery?

Murrell: Yes, sir.

Defense: And once they are provided to you, is it your professional practice to copy those materials and provide them to your client?

Murrell: Yes, sir.

Defense: Is that something you make a point to do?

Murrell: It is my professional practice to do that. Yes, sir.

Appellant argues that the trial court erred when it would not allow him to ask the questions that he proposed to ask of Murrell, i.e., whether she and Reese discussed the possibility that he would have to testify against Appellant and whether she had provided him with discovery materials. We agree with Appellant's contention that the trial court's rulings were erroneous, but find the errors harmless in this case.

KRE 503(b) provides that:

A client has a privilege to refuse to disclose and to prevent any other person from disclosing a confidential communication made for the purpose of facilitating the rendition of professional legal services to the client (i) between the client or a representative of the client

and the client's lawyer or a representative of the lawyer . . . .

KRE 503(a)(5) states that "[a] communication is 'confidential' if not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication."

▮▮▮▮ Appellant's proposed question as to whether Murrell had furnished Reese with the discovery materials turned over to her by the Commonwealth did not implicate the KRE 503 privilege. "Attorneys may testify as to matters affecting a client so long as such matters do not relate to confidential communications." *Futrell v. Shadoan*, Ky., 828 S.W.2d 649, 651 (1992) (citing *Hyden v. Grissom*, 306 Ky. 261, 206 S.W.2d 960, 963 (1947) ("An attorney may testify as to matters affecting the client, except as to confidential communications.")). If Murrell had testified that she had furnished discovery materials to Appellant, her testimony would have been a "revelation of an act in which [s]he participated, not of a confidential disclosure," *United States v. Freeman*, 619 F.2d 1112, 1119–1120 (5th Cir.1980), and the Kentucky Evidence Rules Study Commission's commentary to KRE 503 states that "[t]he privilege does not extend to . . . *non-communicative* acts." (emphasis in original). Because "[c]ommunications from attorney to client are privileged only if they constitute legal advice, or tend directly or indirectly to reveal the substance of a client confidence," Robert G. Lawson, *The Kentucky Evidence Law Handbook*, § 5.10 at 233 (3d Ed.1993) (quoting *United States v. Defazio*, 899 F.2d 626, 635 (7th Cir.1990)), any vestige of "communicative intent" represented by a bundle of the opposing party's discovery materials that have been duplicated by an attorney for his or her client falls outside the scope of KRE 503. The trial court's erroneous ruling on this proposed question was harmless error in this case, however, because the record from the bench conference makes it clear that Murrell had no specific knowledge of whether she had furnished Reese with discovery materials and that her case file, which presumably might have refreshed her memory, had been destroyed in a flood. In fact, Appellant's trial counsel stated to Murrell during this bench conference that "I know from our discussions, that even if you were to answer that question, your answer would have to be you don't know because the file was destroyed in the flood." Thus, even if the trial court had permitted Appellant to ask the question, Murrell's answer would not have been probative. And, by permitting Appellant to introduce evidence of Murrell's professional practice (a.k.a. her "habit") of providing discovery to her clients, the trial court more than accommodated the defense by allowing it to introduce evidence that is inadmissible in Kentucky. *See Burchett v. Commonwealth*, Ky., 98 S.W.3d 492 (2003).

▮▮▮▮ We agree with Appellant's argument that Reese's testimony concerning discussions with his attorneys as to whether he would be required to testify against Appellant waived any privilege as to those communications under KRE 503. In response to questions posed to him on cross-examination, Reese testified at trial that he recalled discussions with his attorneys about whether he would have to testify and that the "answer" was that he "would have to come testify" unless he had an appeal pending. KRE 509 provides that "[a] person upon whom these rules confer a privilege against disclosure waives the privilege if he . . . voluntarily discloses or consents to disclosure of any significant part of the privileged matter." Having disclosed the substance of his communications with his attorneys, Reese could not assert the KRE

503 privilege as a bar to testimony from his attorney as to those same communications. Given that Reese testified that it was his understanding that he would be required to testify, however, the trial court's erroneous ruling was harmless because, in the best case scenario for Appellant, Murrell's testimony would have been merely cumulative.

### 6. DISCOVERY AS TO KINCAID (# 21)

 The trial court found that the Commonwealth had inadvertently breached its discovery obligations under RCr 7.24(1) and 7.26(1) by failing to produce for the defense—until the day that Scott Kincaid, an inmate at the Oklahoma State Prison testified—a letter that Kincaid had written to the Commonwealth in February 1996—approximately two and a half (2½) years prior to trial. Although the Commonwealth had previously disclosed to the defense that the substance of Kincaid's testimony was that Appellant had confessed to murdering Brady, the letter contained substantial detail regarding Appellant's incriminating statement to Kincaid that had not been previously disclosed to the defense, i.e., "he admitted to me that he himself killed Frank Brady their [sic] in Kentucky by shooting him twice with a .357 while he was handcuffed. (In front) and also admitted he shot at a K.S. trooper trying to kill him. St. Clair also told me the [sic] he was going to denie [sic] being in Kentucky and that he was going to blame it on Reese." Accordingly, pursuant to the discretion that the Rules of Criminal Procedure grant Kentucky trial courts to remedy discovery violations, see RCr 7.24(9), the trial court ruled that Kincaid could "relate the fact that Mr. St. Clair informed him that he murdered Mr. Brady, but that it would not 'allow this witness to relate the other information contained in this letter' " because the Commonwealth had not timely provided it to

the defense. Kincaid testified that "Michael admitted to me to killing Mr. Frank Brady" and that, in the course of that conversation, Appellant had admitted to personally shooting Brady. Appellant argues that the trial court should have prevented the Commonwealth from soliciting any testimony from Kincaid about Appellant's confession to him. RCr 7.24(9) states that:

If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or an order issued pursuant thereto, the court may direct such party to permit the discovery or inspection of materials not previously disclosed, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may enter such other order as may be just under the circumstances.

Here, the trial court prohibited the Commonwealth "from introducing in evidence the material not disclosed," and we find no abuse of discretion in the trial court's choice of remedy for the Commonwealth's discovery violation. See Hodge, 17 S.W.3d at 849–50.

### 7. TROOPER BENNETT'S IDENTIFICATION TESTIMONY (# 23)

 Appellant maintains that a suggestive photographic "show up" procedure employed in this case rendered Trooper Bennett's identification of Appellant unreliable. Consequently, Appellant contends that the trial court should have: (1) suppressed all testimony concerning Trooper Bennett's out-of-court identification; and (2) prohibited Trooper Bennett from identifying Appellant at trial as the man who stepped out of the passenger side of Brady's pickup truck on October 7, 1991 and fired shots in his direction. The trial court conducted an evidentiary hearing on Appellant's motion at which Trooper Bennett

and FBI Special Agent Phillip Lewzader testified. Following the hearing, the trial court entered a written order denying Appellant's motion to suppress in which it accurately outlined the facts as demonstrated at the hearing:

On October 7, 1991, Bennett was dispatched to investigate a report of a truck on fire on Flint Hill Road. He arrived around midnight, or shortly thereafter, and observed a burned pickup truck still smoldering. The fire department had preceded him and apparently extinguished the fire. A witness informed Bennett that a maroon or dark brown Ranger was seen in the area.

Bennett left after approximately 45 minutes and returned to normal patrol. During the course of the evening, in Sonora, Kentucky at the Union 76 Truck Stop, he observed a Ranger pick-up truck in the parking lot matching the description given to him by the witness. He passed the parking lot, turned around, and observed that the Ranger was now in another location in the parking lot. As the Ranger left the parking lot Bennett observed two white males in the vehicle. He ran a check on the license plate and then proceeded to follow the Ranger onto Interstate 65 headed north for a distance of approximately two miles. When he activated his blue lights the Ranger abruptly pulled to the right and stopped in the emergency lane. Bennett pulled his cruiser into the emergency lane and while his cruiser was still rolling he observed someone exiting from the passenger's side. Bennett stopped his cruiser about two car lengths behind the rear of the Ranger. At that time the passenger was standing behind the truck behind the right rear wheel.

The weather was clear and cold and Bennett related that he does not wear glasses. Bennett trained his spot light directly on the passenger. The passenger raised a handgun and fired two shots directed toward Bennett. Bennett ducked behind the dash board of his cruiser and when he raised up the Ranger was exiting the emergency lane and proceeding north on Interstate 65. Bennett related that he made a positive identification of the person who fired the handgun and that he was a white male, 5' 10", 180 pounds, brown or black hair (Bennett says this was a typo—it should have been brown or blond hair) and a scruffy bead.

Later in the evening on October 8, 1991, Bennett, while at home, was informed by dispatch that an FBI agent wanted to talk to him. He went to the State Police Post in Elizabethtown and met with Phillip Lewzader, a Special Agent with the Federal Bureau of Investigation. Lewzader exhibited to Bennett two photographs (mug shots). Bennett made a positive identification of the photo depicting the Defendant, Michael Dale St. Clair, as having been the person who fired two shots at him with a handgun; however, could not identify the second photograph. Agent Lewzader did not identify the name of either individual portrayed in the photographs.

Trooper Bennett initially testified that he had received training in identifying suspects at the Kentucky State Police Academy and an additional 40 hours of training per year and had made thousands of vehicle stops in the 23 years that he had been with the Kentucky State Police.

The trial court's order then identified the controlling precedent, applied that precedent to the facts of the case, and concluded that Trooper Bennett's identification was reliable:

Considering the totality of the circumstances of this case, when reviewed in light of the criteria set forth in *Neil v.*

*Biggers,* 409 U.S. 188, 196–7, [93 S.Ct. 375, 34 L.Ed.2d 401 (1972)] the Court finds the photos were not misleading as to require suppression of Bennett's pretrial identification of the Defendant.... Applying [the *Neil v. Biggers*] factors to the facts of this case, the Court concludes that the identification made by Bennett of the Defendant's photograph was reliable. The Court finds that the procedure utilized by Special Agent Lewzader did not create a situation in which there was a substantial likelihood of irreparable misidentification.

At trial, the Commonwealth introduced evidence of Trooper Bennett's October 8, 1991, identification of Appellant from the photograph presented to him by Special Agent Lewzader. In addition, Trooper Bennett identified Appellant in court.

 We agree with the trial court's ruling on Appellant's motion to suppress this testimony. The relevant United States Supreme Court precedent, *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), establishes "a two-prong due process test," *Wilson v. Commonwealth,* Ky., 695 S.W.2d 854, 857 (1985), under which the court "must first determine whether the confrontation procedures employed by the police were 'suggestive' [and then] [i]f [it] conclude[s] that they were suggestive, [it] then must assess the probability that the witness would make an irreparable misidentification, based on the totality of the circumstances[.]" *Id.* Although Appellant correctly observes that this Court has held that "the display ... of a single mug shot ... unaccompanied by any other pictures, was unnecessarily suggestive," *Moore v. Commonwealth,* Ky., 569 S.W.2d 150, 153 (1978) (citing *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)), we held in the same case that, despite the suggestive procedure, "[t]he crucial question ... is whether [the] in-court identification of appellants was reli-

able despite this suggestiveness, i.e., whether [the witness] likely would have been able to identify [the suspects] even if a proper photographic identification procedure had been utilized." *Moore,* 569 S.W.2d at 153. Because the photographic "show-up" procedure employed in the case at bar was sufficiently suggestive to satisfy the first prong of the *Neil v. Biggers* analysis, the relevant inquiry is thus "whether, under the 'totality of the circumstances,' the identification was reliable even though the confrontation procedure was suggestive." *Neil v. Biggers,* 409 U.S. at 199, 93 S.Ct. at 382.

 The United States Supreme Court has identified five (5) factors to be considered in evaluating the likelihood of misidentification: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the time of identification; and (5) the length of time between the crime and the confrontation. *Id.,* 409 U.S. at 199–200, 93 S.Ct. at 382. In addition to these five (5) factors, this Court has also considered whether other evidence tends to corroborate the witness's identification. *See Merriweather v. Commonwealth,* Ky., 99 S.W.3d 448, 452 (2003); *Roark v. Commonwealth,* Ky. 90 S.W.3d 24, 29 (2002). In applying these factors to Trooper Bennett's identification, we find it to be reliable despite the suggestive photographic lineup procedure. Because of the position of his cruiser and the fact that his spotlight illuminated Appellant, Trooper Bennett had ample opportunity to view him. Trooper Bennett's attention was sufficiently attuned to Appellant, who was, after all, firing a handgun in his direction at the time. While not perfect, Trooper Bennett's prior description was a fair repre-

sentation of Appellant. At the suppression hearing, Trooper Bennett testified that, when he identified Appellant from the photograph presented to him "I was sure. I mean, sure is sure" and Special Agent Lewzader testified that Trooper Bennett "was absolutely certain" of his identification, which came less than twenty-four (24) hours after the shooting incident. In addition, Trooper Bennett's identification of Appellant is corroborated by Reese's testimony and significant circumstantial and forensic evidence. "[T]he totality of the circumstances indicate that Appellant's due process rights were not violated," *Merriweather*, 99 S.W.3d at 451.

## 8. PHOTOGRAPHS (# 25)

At trial, the trial court permitted the Commonwealth to introduce fourteen (14) pictures of the victim's body—four (4) of which depicted the body at the crime scene and ten (10) of which were taken at an autopsy. The trial court specifically found that "the photographs in question ... will assist the jury in making a determination as to the cause of death in this case" and thus concluded that "the probative value of this evidence outweighs any possible prejudice to the defendant." Appellant argues that the photographs, which he describes as "gruesome and repetitive" should have been excluded from evidence as "substantially more prejudicial than probative." KRE 403. "[R]elevant pictures are not rendered inadmissible because they are gruesome and the crime heinous." *Clark v. Commonwealth*, Ky., 833 S.W.2d 793, 794 (1991). *See also Epperson*, 809 S.W.2d at 843 ("[E]ven gruesome photographs are admissible if they have probative value."). The trial court did not abuse its broad discretion when it permitted the Commonwealth to introduce these photographs. *See Woodall*, Ky., 63 S.W.3d at 130.

## 9. FINGERPRINT EVIDENCE (# 43)

Appellant argues that the trial court should have excluded the Commonwealth's fingerprint evidence at trial because he was denied an opportunity to conduct independent testing when the Commonwealth released Brady's and Keeling's trucks after it processed the vehicles for latent fingerprints. However, "[t]o warrant any relief, Appellant was required to demonstrate bad faith on the part of the police." *Crowe v. Commonwealth*, Ky., 38 S.W.3d 379, 385 (2001) (citing *Arizona v. Youngblood*, 488 U.S. 51, 57, 109 S.Ct. 333, 337, 102 L.Ed.2d 281, 289 (1988)). *See also Kirk v. Commonwealth*, Ky., 6 S.W.3d 823, 826 (1999) ("Absent a showing of bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of the due process of law."); *Allen v. Commonwealth*, Ky. App., 817 S.W.2d 458, 462 (1991). *Cf. Estep v. Commonwealth*, Ky., 64 S.W.3d 805, 811 (2002) ("[T]he Due Process Clause is implicated only when the failure to preserve ... evidence was intentional and the potential exculpatory nature of the evidence was apparent at the time it was lost or destroyed.") In the case at bar, the Commonwealth explained in its response to Appellant's motion that "it is normal police procedure to release motor vehicles to their lawful owners after the vehicles have been processed for latent fingerprints. To retain custody is of little utility, since the latent fingerprints on the vehicle are often completely removed by the lifting process, and continued retention may be very burdensome to the lawful owners of vehicles seized." Appellant points us to "nothing in the record to support a different conclusion." *Kirk*, 6 S.W.3d at 826. We further observe that the Commonwealth provided Appellant with the information and notes incident to the lifting of the latent fingerprints, including the investigative reports from the officers who lift-

ed the prints, photographs of the vehicle in question, and examination of the latent impressions, which distinguishes this case from *Green v. Commonwealth,* Ky.App., 684 S.W.2d 13, 16 (1984), the authority upon which Appellant relies. In past cases where evidence of bad faith is lacking and the notes and other information incident to the Commonwealth's testing is provided to the defense, we have found no merit in challenges to the admissibility of evidence collected from automobiles premised upon the Commonwealth's release of automobiles before the defense could pursue independent testing. *Perdue v. Commonwealth,* Ky., 916 S.W.2d 148, 159 (1995); *Johnson v. Commonwealth,* Ky., 892 S.W.2d 558, 560–561 (1994). Appellant "has failed to demonstrate ... bad faith under the standard recognized in this Commonwealth, [and][t]hus we cannot conclude that Appellant was denied due process of law." *Collins v. Commonwealth,* Ky., 951 S.W.2d 569, 573 (1997).

## 10. *ALLEGEDLY IMPROPER CROSS–EXAMINATION (# 36)*

Appellant argues that the Commonwealth's cross-examination of three (3) defense witnesses—Dr. Ondrovik, Ernest Smith, and Appellant, himself—contained improper questioning. We find no reversible error.

■ During Appellant's trial counsel's direct examination of Dr. Ondrovik, she testified about the testing she conducted upon Reese in connection with her psychological evaluation of him. On cross-examination, the Commonwealth asked Dr. Ondrovik to identify four (4) questions on the Minnesota Multiphasic Personality Inventory ("MMPI") test, a five hundred and fifty (550) question examination, that she had administered to Reese—*e.g.,* "I wake up fresh and rested most mornings"; "I wish I could be as happy as others seem to be"; "I believe I am being plotted against"; and "I hear strange things when

I am alone." During its culpability phase closing argument, the Commonwealth referenced these questions and argued that Dr. Ondrovik's diagnosis was "based on some true/false questions which had limited utility for a person in custody." Appellant argues that this questioning and argument was "irrelevant, misleading, and highly prejudicial." We disagree. Although the Commonwealth likely focused upon the questions that were least relevant to an incarcerated inmate in order to raise questions about the reliability of the results of Dr. Ondrovik's examination, the Commonwealth's questioning was permissible cross-examination, and Appellant's complaints address themselves only to the weight that should be given to this questioning, not whether the questions themselves were permissible.

■ After uncovering a somewhat minor factual discrepancy between Dr. Ondrovik's trial testimony and the report she had previously prepared as to Reese's competency, the Commonwealth asked her a sarcastic, "we all sometimes have memory losses, don't we?" question that was clearly not the pinnacle of professionalism. The trial judge is, however, in a much better position to moderate the give-and-take of counsel and witnesses during a trial, and it does not appear from the record that Appellant was prejudiced by the Commonwealth's "question."

■ Earnest Smith, a inmate at the Oklahoma State Prison who had formerly worked as a law library clerk, testified that Reese had sought his assistance in obtaining some legal research about accomplice testimony, "mentioned that he had killed a man in Kentucky for his pickup," and gave Smith the impression that Appellant and Reese had parted ways "pretty soon afterwards after the escape." Appellant argues that the Commonwealth "injected a false issue into the case" when it asked a series

of questions of Smith that implied that Smith may have been intimidated to testify falsely by Appellant's brother, Richard St. Clair, another inmate in the prison. Appellant argues that this questioning was improper because the Commonwealth failed to demonstrate a sufficient foundation for its assertion of intimidation and the Commonwealth's questioning as to whether Smith had "use[d] the word 'Bad News' in reference to Richard St. Clair" when he was interviewed by a KSP Detective permitted impermissible character implications about Appellant and his family. The Commonwealth's questioning was a proper topic for cross-examination, *cf. Graves v. Commonwealth*, Ky., 17 S.W.3d 858, 865 (2000), and Smith's ultimate denial that "the content of [his] testimony [was] motivated at all by any concern about Richard St. Clair" eliminated any prejudice to Appellant.

Appellant observes correctly that we have held that a witness should not be required to characterize the testimony of another witness as a lie. *See Moss v. Commonwealth*, Ky., 949 S.W.2d 579, 583 (1997); *Tamme*, 973 S.W.2d at 28. And, although the Commonwealth's cross-examination of Appellant included some questioning that was impermissible under *Moss*, we find no reversible error in the form of the Commonwealth's questioning of Appellant because "we conclude that the totality of the circumstances are persuasive that exclusion of the proper inquires would not have resulted in [a] different verdict[ ] in this case." *Caudill*, 120 S.W.3d at 662.

### 11. *VICTIM SYMPATHY EVIDENCE (# 26)*

▮ The evidence introduced by the Commonwealth as to Brady's punctuality, talent for music, and protective and caring nature did not exceed the parameters of permissible testimony concerning "who and what the victim was prior to death,"

*Wheeler v. Commonwealth*, Ky., 121 S.W.3d 173, 181 (2003). *See Campbell v. Commonwealth*, Ky., 788 S.W.2d 260, 263–4 (1990); *Templeman v. Commonwealth*, Ky., 785 S.W.2d 259, 261 (1990); *McQueen v. Commonwealth*, Ky., 669 S.W.2d 519, 523 (1984).

### 12. *CULPABILITY PHASE CLOSING ARGUMENT (# 27)*

▮ The Commonwealth's culpability phase closing argument did not deprive Appellant of due process or his right to a fair trial. When reviewing claims of error in closing argument, we "focus on the overall fairness of the trial and not the culpability of the prosecutor.... A prosecutor may comment on tactics, may comment on evidence, and may comment as to the falsity of a defense position." *Slaughter v. Commonwealth*, Ky., 744 S.W.2d 407, 411–412 (1987). Reversal is justified only when the alleged prosecutorial misconduct is so serious as to render the trial fundamentally unfair. *Summitt v. Bordenkircher*, 608 F.2d 247 (6th Cir.1979); *Stopher*, 57 S.W.3d at 805. In this case, the Commonwealth did not go beyond the permissible boundaries of closing argument, and there is no evidence of prosecutorial misconduct that would render Appellant's trial fundamentally unfair.

### 13. *KSP LAPEL PINS (# 48)*

▮ Appellant argues that he was denied due process and his right to a fair and impartial jury because the prosecuting attorneys in this case wore Kentucky State Police lapel pins. One pin was "smaller than the diameter of a dime" and the others were one inch (1″) wide and nine-sixteenths of an inch (9/16″) tall. We find Appellant's overblown claims that "[t]he KSP lapel pin amounted to a form of symbolism conveying ideas of law and order and safety and security" and that "[t]here

is no way to measure the passion such a symbol might invoke" unpersuasive. The trial court did not abuse its discretion when it overruled Appellant's objection and declined to exercise a veto power over the attorneys' fashion choices.

## 14. *PUBLIC TRIAL (# 3)*

Appellant argues that, before the trial court's attention was brought to the matter, members of the public were excluded from his trial proceedings by Kentucky State Police officers acting at the direction of Assistant Attorney General David Smith and another representative from the Attorney General's Office. Appellant argues that the trial "was completely closed to the press and public during the five days of jury selection" and that, during the first six days of the Commonwealth's case-in-chief, officers excluded certain members of the public, including a Department of Public Advocacy Intern who was allegedly denied entry to the courtroom on September 3, 1998. We disagree with Appellant's claim that his federal and state rights to a public trial were violated in this case.

 The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." Section Eleven of the Kentucky Constitution similarly guarantees a criminal defendant's right to "a speedy public trial by an impartial jury of the vicinage." These rights are "for the benefit of an accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." *Gannett Co. v. DePasquale*, 443 U.S. 368, 380, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979) (quoting *In re Oliver*, 333 U.S. 257, 270 n. 25, 68 S.Ct. 499, 92 L.Ed. 682 (1948)). *See also Lexington Herald Leader Co., Inc. v. Tackett*, Ky., 601 S.W.2d 905, 907 (1980)

("Courtrooms are kept open not so that members of the public can expose wrongdoing; rather, they are open to allow the citizens to see for themselves how their laws are impartially applied."); *Johnson v. Simpson*, Ky., 433 S.W.2d 644, 646 (1968) ("The principle that justice cannot survive behind walls of silence is ... deeply imbedded in our Anglo–American judicial system[.]"). However, it is clear that the determination of whether a trial is "public" within the contemplation of these constitutional guarantees is a broader inquiry than Appellant's contentions would suggest. This Court and its predecessor have held that the exclusion of a single member (or even a handful of members) of the public from trial proceedings will not convert an otherwise public trial into a "star chamber." *Wendling v. Commonwealth*, 143 Ky. 587, 137 S.W. 205, 211 (1911) ("The provision in section 11 of the Constitution recognizing the right of an accused to have a public trial does not mean that all of the public who desire to be present shall have opportunity to do so ... 'The requirement is fairly observed if ... a reasonable proportion of the public is suffered to attend.'") (quoting 1 T. Cooley, *Constitutional Limitations*, 378 (6th ed.)). *See also Turner v. Commonwealth*, Ky., 914 S.W.2d 343, 348 (1996) ("Removal of one child from a portion of a trial is hardly equivalent to closing the courtroom to the public."); *Wilson v. Commonwealth*, Ky., 836 S.W.2d 872, 884 (1992) ("The exclusion of one person from the remainder of cross-examination of the last witness in the guilt phase of a trial can hardly be characterized as a denial of a public trial."); *Tinsley v. Commonwealth*, Ky., 495 S.W.2d 776, 781 (1973) ("Representatives of the news media were present, and it is apparent that the courtroom was substantially filled to capacity.... There is nothing in our case law which stands for the proposition that the constitutional guarantee demands

that all the public who desire to attend be admitted.").

Because we agree with the Commonwealth that the record reflects that the exclusion of the public during individual voir dire occurred, if not at Appellant's trial counsel's suggestion, at least with his consent, we deem any complaint as to those proceedings waived and focus upon Appellant's other claim. On June 25, 1998, the trial court entered an "Order Pertaining to Court Security and Media," which, among other things, required everyone who entered the courtroom to be searched and scanned through a metal detector, prohibited weapons from the courtroom, stated that no one would be permitted to enter or exit the courtroom on their own volition while court was in session, and restricted access to the second floor of the courthouse. These measures were consistent with procedures that we have approved in other cases, and we observe that such measures are often necessary to prevent interruptions in the flow of the trial and possible diversions of the jury's attention from the testimony of the witnesses. These brief and limited closures of the proceedings were not a significant encroachment upon Appellant's right to a public trial.

Affidavits from Bullitt County Sheriff Charles Knusler, Deputy Sheriff Paul Parsley, Kentucky State Police Sergeant Richard D. Rowland, and L. Edward Hoskins of the Administrative Office of the Courts stated that the only times the public or media where prohibited from entering the courtroom was when court was in session. Affidavits submitted by Appellant's trial counsel and a DPA intern suggest that the intern was denied entry to the courtroom during a period of time when the trial court was not in session because she "was not on the list" and had not been "vouched for" by one of the parties. When the incident involving the DPA intern was brought to the trial court's attention, the court denied Appellant's motion for a mistrial, but made it clear that "anybody that wants to come in this trial can come in as long as they behave themselves and don't carry any weapons" and took steps to inform security that "if they have a misconception ... the public is not excluded from this trial." In his argument to the trial court, Appellant's trial counsel stated "where the order or the mis-order, or the miscommunication, or whatever it was came from that lead the sheriffs to believe that their orders were to exclude the public, I don't know .... I know it didn't come from the Court. It is not in the Court's security order." To the extent that the affidavits suggest that the persons responsible for executing the trial court's order may have exceeded their authority, that fact does not demonstrate a denial of Appellant's right to a public trial in this case. *Compare Jackson v. Commonwealth,* 100 Ky. 239, 38 S.W. 422, (1896) (finding no abridgment of the right to a public trial on the facts presented and distinguishing a Michigan case in which the trial court was informed that the sheriff responsible for court security was arbitrarily excluding members of the public, and the court "refused to take any notice of the complaint, and left the officer to exercise his discretion as to what respectable citizens he should admit."). In the case at bar, the trial court remedied the situation as soon as the incident involving the DPA intern was brought to his attention, and we conclude that "[t]his was a public trial within the meaning of the constitutional guarantee." *Tinsley,* 495 S.W.2d at 780.

### 15. *APPELLANT'S PRESENCE AT HEARINGS (# 42)*

RCr 8.28 provides:

The defendant shall be present at the arraignment, at every critical stage of

the trial including the empaneling of the jury and the return of the verdict, and at the imposition of the sentence.

Appellant complains of his absence from "at least four pre-trial and three post-trial hearings." Appellant, however, cites no authority for his assertion that he had a right under RCr 8.28(1) or the federal or state constitution to be present at the post-trial proceedings. In addition, each of the "four" dates identified in Appellant's brief was a scheduled hearing on legal arguments, and on none of those occasions was an evidentiary hearing conducted. Specifically, the trial court heard arguments from counsel: (1) on January 22, 1996, as to Appellant's motions to strike the death penalty, to dismiss the indictment because the Kentucky State Police had released the pickup trucks, to declare KRS 532.025 unconstitutional, and to determine whether Appellant was being held pursuant to the UCEA or the I.A.D; (2) on October 28, 1996, as to the Commonwealth's motion to continue the trial; (3) on June 23, 1997, as to Appellant's trial counsel's motion to withdraw because of Appellant's romantic attachment to her; and (4) on March 9, 1998, as to nothing, because the hearing was rescheduled to March 23, 1998, at which time Appellant was present. We recently held that such hearings are not "critical stages of the trial" at which the defendant must be present:

A defendant is not required to be present during the argument of legal issues between court and counsel. *Tamme v. Commonwealth*, Ky., 973 S.W.2d 13, 38 (1998); *Thomas v. Commonwealth*, Ky., 437 S.W.2d 512, 515 (1968); *Harris v. Commonwealth*, Ky., 285 S.W.2d 489, 491 (1955). "A defendant's absence means little when, as in the present case, the trial court's communication merely involves a question of law rather than fact. In such a case, a defendant's presence can be of no help

to the defense." *United States v. Dockter*, 58 F.3d 1284, 1287 (8th Cir.1995). *Caudill*, 120 S.W.3d at 652. Accordingly, Appellant's absence from these hearings was not improper.

16. *SEQUESTRATION (# 51) AND SEPARATION (# 39)*

■ Appellant contends that he is entitled to a new trial because the trial court: (1) refused to sequester the jury from the beginning of voir dire until the end of the trial; and (2) permitted the jury to separate after penalty phase instructions were distributed and closing arguments made, but before the jury's deliberations commenced. We find no error.

■ RCr 9.66 provides:

Whether the jurors in any case shall be sequestered shall be within the discretion of the court, except that in the trial of a felony charge, after the case is submitted for their verdict, they shall be sequestered unless otherwise agreed by the parties with approval of the court.

The plain language of this rule provides that "[s]equestration is required *only* after a felony case has been submitted to a jury for its verdict." *Bowling v. Commonwealth*, Ky., 873 S.W.2d 175, 182 (1993) (emphasis added). Accordingly, until the case is submitted to the jury for its deliberations, "sequestration of the jury is discretionary." *Smith v. Commonwealth*, Ky., 734 S.W.2d 437, 445 (1987). *See also Wilson*, 836 S.W.2d at 889 ("The decision to sequester the jury resides within the discretion of the trial court from the outset of the proceedings."). "Unless there is a showing that there has been an abuse of such discretion or that jury tampering has occurred there is no error in permitting the separation of the jury." *Daniels v. Commonwealth*, Ky., 404 S.W.2d 446, 447 (1966). We find no abuse of discretion or showing of prejudice in this case. First,

"there is no authority for sequestering potential jurors prior to their selection," *Smith*, 734 S.W.2d at 445, and the trial court therefore did not abuse its discretion "in refusing to sequester the entire panel of qualified potential jurors[.]" *Id.* Second, while sequestration is mandatory (unless the parties agree otherwise) after the culpability or penalty phase deliberations have begun, *see McIntyre v. Commonwealth*, Ky.App., 671 S.W.2d 775 (1984), RCr 9.66 does not require a trial court to sequester a jury between the guilt and sentencing phases of a bifurcated trial, *Wilson*, 836 S.W.2d at 888, and the trial court in this case did not err by exercising its discretion and permitting the jury to separate after the capital sentencing phase closing arguments, but before it submitted the case to the jury for its deliberations. Appellant "has failed to demonstrate how he suffered any prejudice by the exercise of the discretion of the trial judge in this case." *Bowling*, 873 S.W.2d at 182. *See also Wilson*, 836 S.W.2d at 888.

### 17. *NON–EXHIBITS IN JURY ROOM (# 29)*

The trial court did not abuse its discretion when it denied Appellant's motion for a mistrial after it was discovered that two (2) items that had not been introduced into evidence—Van Zandt's videotaped deposition and a chart prepared by a law enforcement officer—were erroneously sent back to the jury room when the jury began its culpability phase deliberations and remained there for approximately thirty (30) minutes before the error was discovered and the items were retrieved. A mistrial is appropriate only where the record reveals "a manifest necessity for such an action or an urgent or real necessity." *Skaggs*, 694 S.W.2d at 678 (quoting *Wiley v. Commonwealth*, Ky. App., 575 S.W.2d 166 (1978)). Because the trial court is "far more 'conversant with the factors relevant to the determination'

than any reviewing court can possibly be[,]" *Arizona v. Washington*, 434 U.S. 497, 513, 98 S.Ct. 824, 834, 54 L.Ed.2d 717 (1978) (quoting *Wade v. Hunter*, 336 U.S. 684, 687, 69 S.Ct. 834, 836, 93 L.Ed. 974 (1949)), "the trial court must have a measure of discretion." *Grimes v. McAnulty*, Ky., 957 S.W.2d 223, 225 (1997). *See also Jones v. Commonwealth*, Ky.App., 662 S.W.2d 483, 484 (1983) ("Here again we must rely upon the good sense of the trial court in not declaring a mistrial unless a matter of substance is involved."). The record reflects that there was no VCR in the jury room, and thus the jury had no means of playing Van Zandt's videotaped deposition testimony. When polled by the trial court, the jurors indicated that none of them had inspected the chart, which was retrieved from the jury room in the same "rolled up" condition in which it entered the room. As such, it does not appear that the items had any effect upon the jury's deliberations, and the trial court did not abuse its discretion when it denied Appellant's motion for a mistrial in this case.

### 18. *CUMULATIVE ERROR (# 59)*

No cumulative error occurred that requires reversal of Appellant's Murder conviction. *Compare Funk v. Commonwealth*, Ky., 842 S.W.2d 476, 483 (1992).

### E. CULPABILITY PHASE INSTRUCTIONS (# 30)

We find no merit in any of Appellant's allegations of error with respect to the trial court's culpability phase instructions. First, Appellant was not entitled to an instruction that informed the jury it should closely scrutinize accomplice testimony. *Hodge*, 17 S.W.3d at 850 (2000). (We observe that the former RCr 9.62, which authorized such an instruction, was repealed in 1980.)

Second, the trial court correctly denied Appellant's belated request for a written instruction that informed the jury

as to the purpose of the Commonwealth's KRE 404(b) evidence. Appellant cites no authority for the suggestion that KRE 105 permits a defendant to wait until the close of evidence and then request a written instruction defining the appropriate purposes of certain evidence for the jury. Appellant's "means of protection" against the "multiple admissibility dilemma," *i.e.*, the possibility the jury might consider evidence for an improper purpose, is contained in KRE 105(a), which states, "[w]hen evidence which is admissible ... for one purpose but not admissible ... for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and admonish the jury accordingly." *See* Robert G. Lawson, *The Kentucky Evidence Law Handbook*, § 1.05(II) at 17 (Michie 1993) ("The protection of a party against whom mixed admissibility evidence is admitted takes the form of a jury admonition limiting the scope of the evidence to its proper purpose."). *See also Barth v. Commonwealth*, Ky., 80 S.W.3d 390, 396–7 (2001), *cert. denied*, 538 U.S. 929, 123 S.Ct. 1586, 155 L.Ed.2d 324 (2003). Although "[t]he substantive distinction between admonitions and instructions is not always clear or closely hewn to," *James v. Kentucky*, 466 U.S. 341, 346, 104 S.Ct. 1830, 1834, 80 L.Ed.2d 346, 351 (1984), we interpret the first word of KRE 105(a), *i.e.*, "[w]hen," to mean that *the request for* a "limited purpose" admonition must be made *at the time that the evidence in question is admitted* and no later than after the direct examination at which the evidence is introduced. *See United States v. Thirion*, 813 F.2d 146, 155–156 (8th Cir.1987). The trial court, however, has discretion as to the timing of the admonition itself. *See United States v. Chance*, 306 F.3d 356, 387–88 (6th Cir.2002) (when admitting Rule 404(b) evidence, trial judge has discretion to decide whether to give limiting instruction under Rule 105 at the same time as evidence is introduced or during final instructions); *United States v. Dabish*, 708 F.2d 240, 242–243 (6th Cir.1983) (trial court did not abuse its discretion in giving limiting instruction in jury charge, rather than contemporaneously with presentation of evidence). Here, the trial court appropriately denied Appellant's belated request for an instruction.

▇▇▇▇ Third, while there is "no constitutional principle which requires trial courts to give prophylactic instructions prohibiting punishment discussion," *Jacobs*, 58 S.W.3d at 447, the instruction under which the jury found Appellant guilty informed the jury that if it found Appellant guilty it was to "return [its] verdict to the Court without deliberating on the question of punishment." The trial court did not err in denying Appellant's request for a separate instruction prohibiting discussion of punishment.

Finally, the trial court's Murder instruction, which combined both principal and accomplice liability, was proper. *Caudill*, 120 S.W.3d at 666–67.

## F. CAPITAL SENTENCING PHASE ISSUES

Because we reverse Appellant's death sentence and remand this case to the trial court for a new capital sentencing phase, most of Appellant's allegations of error with respect to the capital sentencing phase of his trial present themselves in various degrees of mootness. We address Appellant's allegations of error, therefore, to the extent that they may be relevant to proceedings upon remand.

### 1. FAILURE TO CHARGE AGGRAVATING CIRCUMSTANCE IN INDICTMENT (# 18)

▇▇▇▇ We find no merit in Appellant's contention that the Commonwealth was precluded from seeking the death penalty because the Bullitt County Grand

Jury's indictment did not identify the aggravating circumstance. Although "a defendant cannot be made to face the sentencing phase of a capital trial unless he or she is first given sufficient notice of the Commonwealth's intention to seek the death penalty[,]" *Commonwealth v. Maricle*, Ky., 15 S.W.3d 376, 379 (2000), "[t]here is no authority supporting [Appellant's] claim that an aggravating circumstance must be described in the indictment." *Wheeler*, 121 S.W.3d at 185. *See also Garland*, Ky., 127 S.W.3d at 546; *Furnish*, 95 S.W.3d at 41. The Commonwealth complied with KRS 532.025(1)(a) by providing Appellant with written notice "prior to trial"—in fact, approximately two and a half (2½) years prior to trial—of the evidence in aggravation that it intended to introduce. "At no time prior to this appeal did defense counsel complain of insufficient notice and Appellant may not claim such at this time." *Id.* In Part III(F)(4), *infra*, we address Appellant's arguments as to the sufficiency of the "evidence in aggravation" identified in the Commonwealth's notice.

## 2. *DECISION NOT TO INTRODUCE MITIGATION EVIDENCE (# 31 & # 50)*

After the jury found Appellant guilty of Murder, an ex parte hearing was held in the trial court's chambers in which Appellant's trial counsel briefly outlined the mitigation evidence that had been prepared, informed the trial court that Appellant had instructed his attorneys not to introduce mitigation evidence and not to plead for his life during the capital sentencing phase, and then asked Appellant on the record "is what I have just said essentially correct?" Appellant answered "It is all true." Appellant's trial counsel then informed the Court that Appellant additionally had "instructed us that he does not wish us ... to plead that his life be spared although he does not object if we make a general argument to the jury" and, again

asked Appellant "[i]s that true?" Appellant responded "Yes, it is." Appellant's trial attorneys then indicated that Appellant's wishes "placed [them] in a position that is antithetical to everything that we have ever been trained to do ... and in everything that we believe we should do." Accordingly, trial counsel moved the trial court to allow them to withdraw and to appoint new counsel for the penalty phase. The trial court denied the motion.

Appellant argues: (1) that the trial court erred by failing to determine whether his waiver of his right to introduce mitigation evidence was knowing, voluntary, and intelligent; and (2) that the trial court should have permitted Appellant's trial counsel to withdraw. Although both issues are rendered largely moot by our reversal of Appellant's death sentence and remand for a new capital sentencing phase, we will address the substance of these issues as they may be relevant to proceedings upon retrial.

Although KRS 532.025 and KRS 532.055(2)(b) permit a defendant to introduce mitigating evidence, the defendant, is "master of his own defense and pilot of the ship[,]" *Jacobs v. Commonwealth*, Ky., 870 S.W.2d 412, 418 (1994), and thus may elect to ignore the advice of his counsel and to waive the presentation of mitigating evidence. *Cf. id.* at 417 ("[The Sixth Amendment] grants to the accused the right to make *his* defense, for it is he who suffers the consequences.") (citing *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)). If a defendant wishes to do so, however, it is incumbent upon the trial court to determine, on the record, whether he or she is competent to make such a waiver and whether the decision to do so is knowing and voluntary. *Id.* at 418. In making this determination, a trial court should:

(1) inform the defendant of the right to present mitigating evidence, and what

mitigating evidence is; (2) inquire both of the defendant and his attorney (if not pro se) whether he or she understands these rights; (3) inquire of the attorney if he or she has attempted to determine from the defendant whether any mitigating evidence exists; (4) inquire what that mitigating evidence is (if the defendant has refused to cooperate, the attorney must relate that to the court); (5) inquire of a defendant and make a determination on the record whether the defendant understands the importance of mitigating evidence in a capital sentencing scheme, understands such evidence could be used to offset the aggravating circumstances proven by the prosecution in support of the death penalty, and the effect of failing to present that evidence; (6) after being assured the defendant understands these concepts, inquire of the defendant whether he or she desires to waive the right to present such mitigating evidence; and (7) make findings of fact regarding the defendant's understanding and waiver of rights.

*Battenfield v. Gibson*, 236 F.3d 1215, 1233 (10th Cir.2001) (relying upon guidelines established by the Oklahoma Court of Criminal Appeals, but describing such guidelines as "little more than commonsense" and holding that they "should have been substantially followed by the trial court."). If, upon remand, Appellant again elects not to present mitigation evidence and the trial court finds that Appellant's decision to do so is knowing and voluntary, "counsel ... must proceed according to [his] wishes." *Jacobs*, 870 S.W.2d at 418.

▮▮▮▮▮ We disagree with Appellant's contention that his decision not to

introduce mitigating evidence required the trial court to permit his trial counsel to withdraw. When a competent criminal defendant makes a knowing and voluntary waiver of the right to introduce mitigating evidence, his or her attorney will not "fail to provide competent representation to a client," SCR 3.130–1.1, by proceeding in accordance with the defendant's wishes. And, although counsel may have a basis to withdraw if the defendant's decision constitutes the pursuit "of an objective that the lawyer considers repugnant or imprudent," SCR 3.130–1.16(b)(3), counsel may not withdraw if the tribunal orders the representation to continue. SCR 3.130–1.16(5). Given the length of time it took for this case to come to trial, we find no abuse of discretion in the trial court's refusal to permit defense counsel to withdraw on the cusp of the capital sentencing phase. *See Jacobs*, 58 S.W.3d at 449.

### 3. INTRODUCTION OF INFORMATION REGARDING PRIOR CONVICTIONS (# 4)

▮▮▮▮▮ During the capital sentencing phase of Appellant's trial, the Bullitt Circuit Court Clerk testified for the Commonwealth and read the entirety of the Oklahoma prosecutors' informations that led to Appellant's four (4) First–Degree Murder convictions and his Solicitation of Murder conviction. Although written in somewhat flowery prose, each murder information simply detailed: (1) the name of the defendant (and any co-defendant), (2) the date the offense was committed, (3) the offense charged, (4) the name of the victim, (5) the weapon used in each offense (a firearm), and, in the Murder informations, (6) the fact that the victim died.[4] We

---

4. By way of example, the information filed by the Bryan County, Oklahoma prosecutor with respect to Appellant's murder of William Henry Kelsey, Jr., read:

Comes now Larry G. Grant, District Attorney in and for Bryan County, State of Oklahoma, and gives the District Court of Bryan County, State of Oklahoma to know and be informed that the above-named De-

disagree with Appellant's contention that the trial court should have sustained his objection to this evidence, and hold that the trial court properly permitted its introduction. KRS 532.025(1)(a) provides that "the judge shall hear additional evidence . . . including the record of any prior criminal convictions and pleas of guilty or pleas of nolo contendere of the defendant." *See also* KRS 532.025(1)(b) (incorporating the same procedures for capital sentencing proceedings before a jury). We have previously explained that "[t]he purpose of K.R.S. 532.025 is to allow evidence of all relevant and pertinent information so that the jury can make an informed decision concerning the appropriate sentence in a particular case." *Templeman v. Commonwealth*, Ky., 785 S.W.2d 259, 260 (1990). Furthermore, KRS 532.055(2)(a), which governs the penalty phases of "all felony cases,"[5] permits the Commonwealth to introduce evidence of "[t]he nature of prior offenses for which [the defendant] was convicted." This Court has held that KRS

532.055(2)(a) permits the introduction of "a general description of the crime." *Robinson v. Commonwealth*, Ky., 926 S.W.2d 853, 855 (1996). Because the language of the informations contained no more than a "general description" of Appellant's prior convictions, the trial court correctly overruled Appellant's objection.

### 4. *"PRIOR RECORD OF CONVICTION FOR A CAPITAL OFFENSE" (# 5, 6, 8(C))*

Each of these three (3) separate allegations of error take aim upon the aggravating circumstance found by the jury in this case, *i.e.*, "the Defendant has a prior record of conviction for murder, a capital offense." *See* KRS 532.025(2)(a)(1):

> In all cases of offenses for which the death penalty may be authorized, the judge shall consider, or he shall include in his instructions to the jury for it to consider . . . any of the following statutory aggravating . . . circumstances

fendant Michael St. Clair did in Bryan County, State of Oklahoma on or about the 12th of May, 1990 commit the crime of Murder in the First Degree. That is to say the Defendant did unlawfully, wrongfully, knowingly, willfully, and feloniously, without authority of law and with premeditated design to effect the death of one William Henry Kelsey, Jr., a human being. Did then and there kill one William Henry Kelsey, Jr. by means of a firearm loaded with powder and shot, held in the hands of said Defendant and with which he fired shot into the body of the said William Henry Kelsey, Jr. causing mortal wounds. That said William Henry Kelsey, Jr. did languish and die contrary to the form of the statutes in such cases and made and provided, and against the peace and dignity of the State of Oklahoma.

5. We recognize that this Court has, in its prior decisions, treated Truth–in–Sentencing proceedings in capital cases as distinct from Truth–in–Sentencing proceedings in other felony cases. *See Garland*, 127 S.W.3d at 538; *Allgeier v. Commonwealth*, Ky., 915 S.W.2d

745, 746 (1996); *Francis v. Commonwealth*, Ky., 752 S.W.2d 309, 311 (1988) (stating that "the capital sentencing phase pursuant to KRS 532.025 should be conducted before the truth-in-sentencing hearing under KRS 532.055(2)"). *Cf. Foley v. Commonwealth*, Ky., 942 S.W.2d 876, 886 (1996). However, a recent statutory amendment to KRS 532.055 calls our previous interpretation into question. As originally enacted, KRS 533.055(3) provided: "This section shall not apply to sentencing hearings provided for in KRS 532.025." Accordingly, certain types of evidence that were admissible in non-capital Truth–in–Sentencing proceedings conducted under KRS 532.055 could not be admitted under capital Truth–in–Sentencing proceedings under KRS 532.025. *Allgeier*, 915 S.W.2d at 746 (agreeing that KRS 532.055(3) means that none of KRS 532.055 applies to capital sentencing); *Perdue*, 916 S.W.2d at 164. The 1998 General Assembly, however, deleted this language from KRS 532.055(3). *See* 1998 Ky. Acts. ch. 606, § 72, eff. July 15, 1998. Accordingly, KRS 532.025 now supplements KRS 532.055 in capital cases.

which may be supported by the evidence:

(a) Aggravating circumstances:

(1) The offense of murder or kidnapping was committed by a person with a prior record of conviction for a capital offense, or the offense of murder was committed by a person who has a substantial history of serious assaultive criminal convictions.

 Appellant first argues that KRS 532.025(2)(a)(1) unconstitutionally surrenders the decision whether to impose the death penalty to the jury's subjective beliefs because it is ambiguous and fails to inform the jury what facts it must believe to find the presence of the aggravating circumstance. Appellant submits that the provision is unclear as to the definition of: (1) "prior," *e.g.* "prior" to the commission of the offense or simply at some point "prior" to the capital sentencing phase?; (2) "conviction," *e.g.* a final judgment of conviction or a finding of guilt by a judge or jury?; and (3) "capital offense." Appellant argues, in the alternative, that he was entitled to a directed verdict of acquittal as to the aggravating circumstance because KRS 532.025(2)(a)(1) required that his "conviction for a capital offense" exist prior to the time of Brady's murder. Appellant argues that, although he had four (4) capital convictions for murders committed in Oklahoma by the time he came to trial in Kentucky, he did not have a "prior record of conviction for a capital offense" at the time he murdered Brady because final judgment and sentence had not yet been entered in two (2) of his Oklahoma murder cases and he had yet to stand trial in the others. Finally, Appellant argues that the trial court's capital sentencing phase jury instructions erroneously reformulated the KRS 532.025(2)(a)(1) aggravating circumstance. Because an issue of first impression concerning the proper interpretation of KRS 532.025(2)(a)(1) is at the heart of each of Appellant's allegations of error, we begin our analysis there.

This Court has been asked to address issues as to KRS 532.025(2)(a)(1) only twice. In *Bevins v. Commonwealth*, Ky., 712 S.W.2d 932, 935–6 (1986), the appellant argued that it was improper for the trial court to consider a fifty (50) year old murder conviction as a foundation for the "prior record of a capital offense" aggravating circumstance. *Id.* at 935. We did not address the question presented because the appellant was appealing from a judgment convicting him of five (5) counts of murder arising out of a "shooting spree," *id.* at 933, and was thus already "death eligible" under KRS 532.025(2)(a)(6). *Id.* Seven (7) years later, in *Thompson v. Commonwealth*, Ky., 862 S.W.2d 871 (1993), we reversed the appellant's death sentence because a murder conviction that remained on appeal had been used to prove the KRS 532.025(2)(a)(1) aggravating circumstance:

KRS 532.025(2)(a)(1) lists "a prior record of conviction for a capital offense" as an aggravating circumstance for which the death penalty may be imposed. During appellant's trial, the Commonwealth introduced evidence of this aggravator through the testimony of the Lyon Circuit Clerk. The clerk testified that he had certified records showing that appellant was convicted in Pike County, in 1974, of willful murder under KRS 435.010.

Appellant argues that the conviction from Pike County was improperly used as an aggravator because the 1974 conviction was not final. Appellant's trial for murder, robbery, and escape was in 1986. In 1987, this Court stated that appellant's appeal from the Pike County willful murder conviction "has never been dismissed. It is still pending." *Thompson v. Commonwealth*, Ky., 736 S.W.2d 319, 321 (1987).

The language in KRS 532.025(2)(a)(1) refers to an aggravator as being a "prior record of conviction." It has long been held by Kentucky courts that a "conviction, which of course means the final judgment" cannot be relied upon as a conviction if an appeal is being taken because "an appeal in a criminal case suspends the judgment, and this [sic] does not become final until a termination of the appeal." *Foure v. Commonwealth,* 214 Ky. 620, 283 S.W. 958, 962 (1926). *See also Commonwealth v. Duvall,* Ky., 548 S.W.2d 832 (1977) (conviction that is being appealed is not final and cannot be used for impeachment purposes). More recently this Court has held that a prior conviction cannot be utilized under the truth-in-sentencing statute or the persistent felony offender statutes if an appeal is pending. *Melson v. Commonwealth,* Ky., 772 S.W.2d 631 (1989).

Because appellant's appeal of the 1974 conviction was pending, it was improper for it to be used as an aggravating circumstance in KRS 532.025. As to this issue, a majority of the Court reverses. *Id.* at 877 (footnote omitted).

The parties' positions on this interpretive question are in clear opposition as to whether KRS 532.025(2)(a)(1) requires that the "prior record of conviction for a capital offense" exist at the time of the present capital offense. Appellant emphasizes the past tense of "was committed" and cites *Thompson* in support of its claim that the Commonwealth can demonstrate the applicability of the KRS 532.025(2)(a)(1) aggravating circumstance only by proving that, *at the time that a defendant committed the present offense of Murder or Capital Kidnapping,* the defendant had exhausted all of his or her appeals under a preexisting final judgment of conviction for a capital offense. In contrast, the Commonwealth

relies upon *Haight* and *Templeman,* in which we interpreted the word "prior" in KRS 532.025(1)(a)'s "including the record of any prior criminal convictions" language as authorizing the admission of evidence of subsequently-obtained criminal convictions at a capital sentencing proceeding. *Templeman,* 785 S.W.2d at 260 ("[T]he trial judge was correct in allowing the prosecution to introduce evidence of prior criminal convictions which occurred subsequent to the commission of the crime. The term prior is the status of the defendant at the time of sentencing, not at the time of the commission of the charged crime."); *Haight,* 938 S.W.2d at 253 ("There was no error in the Commonwealth's introduction, pursuant to KRS 532.025, of appellant's criminal convictions which occurred and became final subsequent to his commission of the instant offenses." (citing *Templeman* )). Accordingly, the Commonwealth argues that, to satisfy its burden of proof as to the KRS 532.025(2)(a)(1) aggravating circumstance, it need only demonstrate that, *at the time a capital sentencing proceeding is conducted,* the defendant's criminal record contains a conviction for a capital offense.

Without question, the specific language utilized in an aggravating circumstance is critical to interpreting its scope. *See Young v. Commonwealth,* Ky., 50 S.W.3d 148, 159 (2001) (contrasting the Model Penal Code's *"the murder was committed* for pecuniary gain" aggravating circumstance with Georgia's *"the offender committed the offense* of murder for himself or another for the purpose of receiving money or any other thing of monetary value" aggravating circumstance). Accordingly, we observe that KRS 532.025(2)(a)(1), which was adapted from the Georgia death penalty statute the United States Supreme Court found constitutional in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), parallels an aggravating circumstance found in the Model Penal Code, *i.e.,*

"The defendant was previously convicted of another murder or of a felony involving the use or threat of violence to the person." *Model Penal Code and Commentaries,* Part II, § 210.6(3)(b) (A.L.I.1980).

[Model Penal Code § 210.6](3)(b) deals with the defendant's past behavior as a circumstance for aggravation. Perhaps the strongest popular demand for capital punishment arises where the defendant has a history of violence. Prior conviction of a felony involving violence to the person suggests two inferences supporting escalation of violence: first, that the murder reflects the character of the defendant rather than any extraordinary aspect of the situation, and second, that the defendant is likely to prove dangerous to life on some future occasion. Thus prior conviction of a violent felony is included as a circumstance that may support imposition of the death penalty. *Id.* at 136. A majority of our sister states that permit the imposition of the death penalty have statutorily-authorized aggravating circumstances that, like KRS 532.025(2)(a)(1), address defendants' prior violent crimes, but the majority of aggravating circumstances that specifically reference capital offenses track the Model Penal Code § 210.6(3)(b)'s "the defendant was previously convicted" language.[6] A number of other states have broader aggravating circumstances that also correspond in structure to the Model Penal Code.[7] Five (5) death penalty jurisdictions

6. Ala.Code § 13A–5–49(2) ("The defendant was previously convicted of another capital offense[.]"); Cal.Penal Code § 190.2(2) ("The defendant was convicted previously of murder in the first or second degree. For the purpose of this paragraph, an offense committed in another jurisdiction, which if committed in California would be punishable as first or second degree murder, shall be deemed murder in the first or second degree."); Del.Code Ann. tit. 11 § 4209(e)(1)(i) ("The defendant was previously convicted of another murder or manslaughter[.]"); Fla. Stat. Ann. § 921.141(5)(b) ("The defendant was previously convicted of another capital felony[.]"); Idaho Code § 19–2515(9)(a) ("The defendant was previously convicted of another murder."); La.Code.Crim. Proc. Ann. art. 905.4A(3) ("The offender had been previously convicted of an unrelated murder[.]"); Miss. Code Ann. 99–19–101(5)(b) ("The defendant was previously convicted of another capital offense[.]"); Mont.Code Ann. § 46–18– 303(1)(a)(ii) ("The offense was deliberate homicide and was committed: ... by an offender who had been previously convicted of another deliberate homicide[.]"); Neb.Rev. Stat. § 29–2523(1)(a) ("The offender was previously convicted of another murder[.]"); N.Y. Penal Law § 125.27(1)(a)(ix) ("prior to committing the killing, the defendant had been convicted of murder as defined in this section or section 125.25 of this article, or had been convicted in another jurisdiction of an offense which, if committed in this state, would constitute a violation of either of such sections[.]"); N.C. Gen.Stat. § 15A–2000(e)(2) ("The defendant had been previously convicted of another capital felony or had been previously adjudicated delinquent in a juvenile proceeding for committing an offense that would be a capital felony if committed by an adult."); Ohio Rev.Code Ann. § 2929.04(A)(5) ("Prior to the offense at bar, the offender was convicted of an offense an essential element of which was the purposeful killing of or attempt to kill another[.]"); Or.Rev.Stat. § 163.095(1)(c) ("The defendant committed murder after having been convicted previously in any jurisdiction of any homicide, the elements of which constitute the crime of murder as defined in ORS 163.115 or manslaughter in the first degree as defined in ORS 163.118."); Utah Code Ann. § 76–5–202(1)(h) ("the actor was previously convicted of: (i) aggravated murder, Section 76–5–202; (ii) murder, Section 76–5–203[.]"); Wyo. Stat. Ann. § 6–2–102(h)(ii) ("The defendant was previously convicted of another murder in the first degree or a felony involving the use or threat of violence to the person.").

7. Ark.Code Ann. § 5–4–604(3) ("The person previously committed another felony, an element of which was the use or threat of violence to another person or the creation of a substantial risk of death or serious physical injury to another person."); Colo.Rev.Stat.

have statutory aggravating circumstances that utilize a *"the defendant* has been convicted" structure,[8] but only one (1) of them contains language that expressly limits the timing of the other conviction or convictions.[9] Two (2) other jurisdictions' aggravating circumstances expressly include convictions obtained "at any time" prior to sentencing.[10] Finally, in addition to Kentucky, four (4) states' statutes include an aggravating circumstance that employs the passive voice, "the offense was committed by a person with a prior conviction" wording.[11] Unfortunately, these jurisdictions

Ann. § 18–1.3–1201(5)(b) ("The defendant was previously convicted in this state of a class 1 or 2 felony involving violence as specified in section 18–1.3–406, or was previously convicted by another state or the United States of an offense which would constitute a class 1 or 2 felony involving violence as defined by Colorado law in section 18–1.3–405[.]"); Conn. Gen.Stat. § 53a–46a(i)(2) ("the defendant committed the offense after having been convicted of two or more state offenses or two or more federal offense or of one or more state offenses and one or more federal offenses for each of which a penalty of more than one year imprisonment may be imposed, which offenses were committed on different occasions and which involved the infliction of serious bodily injury upon another person[.]"); Kan. Stat. Ann. § 21–4625(1) ("The defendant was previously convicted of a felony in which the defendant inflicted great bodily harm, disfigurement, dismemberment or death on another."); Okla. Stat. tit. 21 § 701.12(1) ("The defendant was previously convicted of a felony involving the use or threat of violence to the person."); Tenn.Code Ann. § 39–13–204(2) ("The defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person.").

8. Ariz.Rev.Stat. § 13–703(F)(1) ("The defendant has been convicted of another offense in the United States for which under Arizona law a sentence of life imprisonment or death was imposable."); 520 Ill. Comp. Stat. § 5/9–1(b)(3) ("the defendant has been convicted of murdering two or more individuals under subsection (a) of this Section or under any law of the United States or of any state which is substantially similar[.]"); Ind.Code 35–50–2(b)(7) ("The defendant has been convicted of another murder."); N.H.Rev.Stat. Ann. § 630:5(VII)(b) ("The defendant has been convicted of another state or federal offense resulting in the death of a person, for which a

sentence of life imprisonment or a sentence of death was authorized by law.").

9. 42 Pa. Cons.Stat. Ann. § 9711(d)(11) ("The defendant has been convicted of another murder committed in any jurisdiction and committed either before or at the time of the offense at issue.").

10. Nev.Rev.Stat. § 200.033(2):

The murder was committed by a person who, at any time before a penalty hearing is conducted for the murder pursuant to NRS 175.552, is or has been convicted of:
(a) Another murder . . .; or
(b) A felony involving the use or threat of violence to the person of another . . . .
For the purposes of this subsection, a person shall be deemed to have been convicted at the time the jury verdict of guilt is rendered or upon pronouncement of guilt by a judge or judges sitting without a jury.
N.J. Stat. Ann. § 2C:11–3(4)(a) ("The defendant has been convicted, at any time, of another murder. For purposes of this section, a conviction shall be deemed final when sentence is imposed and may be used as an aggravating factor regardless of whether it is on appeal.").

11. Ga.Code Ann. 17–10(b)(1) ("The offense of murder . . . was committed by a person with a prior record of conviction for a capital felony[.]"); Mo.Rev.Stat. § 565.032(2)(1) ("The offense was committed by a person with a prior record of conviction for murder in the first degree, or the offense was committed by a person who has one or more serious assaultive criminal convictions."); S.C.Code Ann. § 16–3–20(C)(a)(2) ("The murder was committed by a person with a prior conviction for murder."); S.D. Codified Laws § 23A–27A–1(1) ("The offense was committed by a person with a prior record of conviction for a Class A or Class B felony, or the offense of murder was committed by a person who has a felony conviction for a crime of violence as defined in subdivision 22–1–2(9).").

do not agree on how to interpret this language. In *Stephens v. Hopper*, 241 Ga. 596, 247 S.E.2d 92 (1978), the Supreme Court of Georgia held that its "prior conviction of a capital felony" aggravating circumstance could be demonstrated with proof of capital felony convictions that were obtained subsequent to the commission of the crime for which the death penalty was sought:

The statutory aggravating circumstance complained of is found in Code Ann. § 27–2534.1(b)(1), which provides in pertinent part that "[t]he offense of murder, rape, armed robbery, or kidnapping was committed by a person with a prior record of conviction for a capital felony . . . ." The appellant argues that at the time he committed the murder of Roy Asbell he did not have a "prior record of conviction for a capital felony." Although the appellant was convicted of a murder and two armed robberies committed prior to the date that he murdered Roy Asbell, these convictions were not obtained until after the murder of Roy Asbell was committed.

This argument raises the question whether, in deciding if the appellant has "a prior record of conviction for a capital felony" the jury should consider his record as of the moment of the crime or as of the time of sentencing. We conclude the latter was intended by the legislature, and at the time of his sentencing Stephens' jury could correctly find that he had such a record. To conclude otherwise would produce the intolerable result that an offender with no prior record could commit numerous separate murders one after the other before being apprehended, and then, at the trials for those murders could Never receive death under this aggravating circumstance even though convicted of each and every one of the murders.

*Id.* at 97. *See also State v. Terry*, 257 Ga. 473, 360 S.E.2d 588 (1987) (after defendant's request for severance of counts for trial, capital convictions obtained at trial for counts 1 and 2 of indictment used as aggravating circumstance at subsequent trial for remaining counts); *Childs v. State*, 257 Ga. 243, 357 S.E.2d 48, 61 (1987) (capital conviction obtained at same trial used to prove aggravating circumstance as to second murder). In *State v. Harris*, 870 S.W.2d 798 (Mo.1994), however, the Supreme Court of Missouri held that its aggravating circumstance "allows the jury to consider only those convictions for first degree murder committed prior to the charged offense." *Id.* at 813. Neither South Carolina nor South Dakota has addressed this issue.

■■■■■■ "The specification of aggravating circumstances is the legislature's prerogative, not ours." *Young*, 50 S.W.3d at 162. Thus, as is the case in any issue of statutory construction, our responsibility is "to ascertain and give effect to the intention of the legislature." *Moore v. Alsmiller*, 289 Ky. 682, 160 S.W.2d 10 (1942). In so doing, we are required by KRS 446.080(4) to construe words and phrases "according to the common and approved use of language." In *Gateway Construction Co. v. Wallbaum*, Ky., 356 S.W.2d 247 (1962), our predecessor described the inquiry as follows:

The best way in most cases to ascertain such intent or to determine the meaning of the statute is to look to the language used, but no intention must be read into the statute not justified by the language. The primary rule is to ascertain the intention from the words employed in enacting the statute and not to guess what the Legislature may have intended but did not express. Resort must be had first to the words, which are decisive if they are clear.

*Id.* at 249. Although, in *Templeman* and *Haight*, we adopted a broader construc-

tion of the legislature's use of the words "prior criminal convictions" when interpreting a different subsection of KRS 532.025, we find the verb tense and phraseology utilized by the General Assembly in KRS 532.025(2)(a)(1) to be unequivocal, *i.e.*, "[t]he offense of murder or kidnapping *was committed by a person with* a prior record of conviction for a capital offense[.]" (emphasis added). We find KRS 532.025(2)(a)(1) susceptible to but one natural and reasonable construction: the aggravating circumstance is implicated only when the defendant has already been convicted of a capital offense prior to the commission of the present capital offense. The word "with" is self-explanatory; in the context used in KRS 532.025(2)(a)(1) it means "[h]aving as a possession, attribute, or characteristic," *American Heritage Dictionary of the English Language* (4th ed.2000). Accordingly, if an unarmed person uses his bare hands to strangle a victim to death, it is an objective fact that the offense was not committed by a person with a handgun. Similarly, in a case where a defendant with no prior criminal record kills Victim A, the murder of Victim A was not committed by a person with a prior record of conviction for a capital offense. The defendant's status *at the time of the offense* does not change if the defendant is subsequently convicted of murdering Victim B. *See Stephens v. Hopper*, 247 S.E.2d at 99 (Marshall, J., concurring in part and dissenting in part). Instead, the murder of Victim A "was committed by" a person who *later became* a person with a prior record of conviction for a capital offense. And, while we agree with the Commonwealth's observation that "[b]oth a backward-looking and a forward-looking inquiry are a permissible part of the sentencing process[,]" *Tuilaepa v. California*, 512 U.S. 967, 977, 114 S.Ct. 2630, 2637, 129 L.Ed.2d 750 (1994), KRS 532.025(1)(a), as interpreted in *Templeman* and *Haight*,

permits the jury to perform the "forward-looking" inquiry by considering the capital offender's full criminal history in determining an appropriate sentence within the available penalty range. It is clear from the language of KRS 532.025(2)(a)(1), however, that a subsequently-obtained capital conviction, standing alone, will not make the defendant "death eligible."

A second interpretative question remains, however, as to what level of finality is contemplated by "a prior record of conviction for a capital offense." We recognize that we stated in *Thompson* that "a 'conviction, which of course means the final judgment' cannot be relied upon as a conviction if an appeal is taken because 'an appeal in a criminal case suspends the judgment, and this [sic] does not become final until a termination of the appeal.'" *Thompson*, 862 S.W.2d at 877 (quoting *Foure*, 283 S.W. at 962). In doing so, however, it appears that we quoted out-of-context the authority upon which we relied), *see Foure*, 283 S.W. at 962 (interpreting the language *"judgment of conviction"* in § 597 of the former Civil Code of Practice), and overlooked nearly a century of jurisprudence from this Court which recognizes that "[t]he word 'conviction' has a twofold meaning. One is the determination of the fact of guilt, as by the verdict of a jury. The other ... denotes the final judgment in the prosecution." *Dial v. Commonwealth*, 142 Ky. 32, 133 S.W. 976, 976 (1911). *See also Kentucky County Judge/Executive Association v. Commonwealth*, Ky.App., 938 S.W.2d 582, 584 n. 1 (1996) ("The definition of 'convict' or 'conviction') has a meaning dual in nature: 'The word 'conviction' has two meanings: its ordinary or popular meaning, which refers to a finding of guilt by plea or verdict, and its legal or technical meaning, which refers to the final judgment entered on plea or verdict of guilty....'" (quoting

21A Am.Jur.2d *Criminal Law* § 1313 at 571 (1998)).

It has been held that the word "convicted" (or "conviction") is equivocal and its meaning can vary according to its use in a particular statute.... The word generally means the ascertainment of defendant's guilt by some legal mode and an adjudication that the accused is guilty. This may be accomplished by a confession by the accused in open court, a plea of guilty or a verdict which ascertains and publishes the fact of guilt. We believe in the majority of ... cases and in the majority of jurisdictions (although we have not counted noses) the word "conviction" is not limited to a final judgment.

*Commonwealth v. Reynolds,* Ky., 365 S.W.2d 853, 854 (1963). *See also Kentucky County Judge/Executive Association,* 938 S.W.2d at 584 n. 1 ("Kentucky law recognizes the equivocal nature of these terms and has held that the meaning implicated depends upon the particular statute in question.").

Kentucky appellate courts have had occasion to interpret the word "convict" or "conviction" in a number of enactments and have concluded that this language connotes a final judgment of conviction in (1) Section 254 of the Kentucky Constitution, *id.* at 584 ("[I]t is clear that the word 'convicts' in this provision of the Constitution means one who is convicted *and* sentenced to a state facility for a felony. A sentence and judgment have been recognized in Kentucky as being essentially the same."); (2) KRS 532.055(2)(a) of Kentucky's Truth-in-Sentencing statute and KRS 532.080(2) & (3) of Kentucky's Persistent Felony Offender (PFO) statute, *Melson v. Commonwealth,* Ky., 772 S.W.2d 631, 633 (1989) ("[A] prior conviction may not be utilized under KRS 532.055 ... or under KRS 532.080 ... unless: (1) The time for appealing the convictions has ex-

pired without appeal having been taken, or (2) Matter of right appeal has been taken pursuant to § 115 of the Constitution of Kentucky and the judgment of conviction has been affirmed."); and (3) in enactments permitting the impeachment of a witness with his or her felony conviction, *Commonwealth v. Duvall,* Ky., 548 S.W.2d 832 (1977); *Foure,* 283 S.W. at 962. *But see Reynolds,* 365 S.W.2d at 856 (holding that, under CR 43.07, a witness "has been convicted so far as this Rule is concerned" and may be impeached with the felony conviction "[i]f it is shown that he has been guilty of a felony and his guilt has been fixed either by a plea of guilty or a verdict of the jury[.]"). For purposes of Kentucky's Felon in Possession of a Handgun statute, KRS 527.040, however, the courts have held that a person is a "convicted felon" upon entry of his or her plea of guilty. *See Thomas v. Commonwealth,* Ky., 95 S.W.3d 828, 829 (2003) ("When Appellant freely, knowingly, and intelligently entered a plea of guilty to first-degree possession of a controlled substance, he acknowledged the fact of having committed a crime and accepted legal responsibility for a criminal act. Thus, Appellant's status as a 'convicted felon' was established, and all that remained was the imposition of sentence."); *Grace v. Commonwealth,* Ky.App., 915 S.W.2d 754, 756 (1996) ("[O]nce the appellant's plea of guilty was accepted by the court, and he was found by the court to be guilty, he became a 'convicted felon' for purposes of KRS 527.040.").

This Court has observed its different interpretations of "conviction" in different statutes are a function of "an attempt by the courts to determine legislative intent in each case." *Reynolds,* 365 S.W.2d at 855. Turning to that inquiry, we again find guidance in KRS 446.080(4): "[a]ll words and phrases shall be construed

according to the common and approved use of language." As the Court of Appeals has observed, the "ordinary or popular meaning" of conviction "refers to a finding of guilt by plea or verdict[.]" *Kentucky County Judge/Executive Association* 938 S.W.2d at 584 n. 1. Further, our rules of statutory construction presume that the legislature is aware of the state of the law at the time it enacts a statute, *Shewmaker v. Commonwealth,* Ky.App., 30 S.W.3d 807, 809 (2000), including judicial construction of prior enactments. *Button v. Hikes,* 296 Ky. 163, 176 S.W.2d 112, 117 (1943) ("It is presumed that the legislature is acquainted with the law; that it has knowledge of the state of it upon subjects upon which it legislates; that it is informed of previous legislation, and the construction it has received."). We therefore find it significant that the General Assembly chose the phrase "prior record of conviction" in KRS 532.025(2)(a)(1)—a phrase that invokes the vernacular notion of a person's "criminal record"—instead of "judgment of conviction," which would have had not only a defined legal meaning, *see* RCr 11.04, but also a body of precedent—specifically *Foure* and *Duvall*—interpreting it to mean a final judgment of conviction. Accordingly, we conclude that, for purposes of KRS 532.025(2)(a)(1), "prior record of conviction for a capital offense" includes a plea of guilty accepted by the trial court or a jury's or judge's verdict of guilty. To the extent that *Thompson* reaches a contrary holding, it is overruled.

▬ In light of our construction of the KRS 532.025(2)(a)(1) aggravating circumstance, Appellant's allegations of error are easily resolved. First, we find that the aggravating circumstance satisfies the Constitutional demands and "provide[s] a meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not," *Godfrey v. Georgia,* 446 U.S. 420, 427, 100 S.Ct. 1759, 1764, 64 L.Ed.2d 398, 406

(1980) (quoting *Furman v. Georgia,* 408 U.S. 238, 313, 92 S.Ct. 2726, 2764, 33 L.Ed.2d 346 (1972) (White, J., concurring)). The statute not only provides "some 'common-sense core of meaning . . . that criminal juries should be capable of understanding[,]' " *Tuilaepa,* 512 U.S. at 967, 114 S.Ct. 2630, 2632, 129 L.Ed.2d at 760 (quoting *Jurek v. Texas,* 428 U.S. 262, 279, 96 S.Ct. 2950, 2959, 49 L.Ed.2d 929 (1976)) (White, J., concurring in judgment), but, in our view, contains clear objective standards from which a jury may determine a defendant's eligibility for a capital sentence. Simply put, KRS 532.025(2)(a)(1) does not permit "[t]he standardless and unchanneled imposition of death sentences in the uncontrolled discretion of a basically uninstructed jury," *Godfrey,* 446 U.S. at 429, 100 S.Ct. 1759, 1765, 64 L.Ed.2d at 407, which the constitution prohibits.

▬ The trial court also correctly denied Appellant's motion for a directed verdict of acquittal with respect to the KRS 532.025(2)(a)(1) aggravating circumstance. Although the final judgments were not entered in Appellant's first two Oklahoma Murder convictions until November 22, 1991, or approximately six (6) weeks after Brady's murder, Appellant acknowledged during his culpability phase testimony that he had been convicted of those two (2) counts of Murder following a trial:

Defense: Where had you been right before that; right before September of '91?

Appellant: I was transferred to Sulfur, Oklahoma—that is Murray County—due to a change of venue waiting trial; weeks before my trial that started in August of 1991.

Defense: You had a trial in August of 1991?

Appellant: Yes, sir.

Defense: When did that trial end?

Appellant: It ended September 12 of 1991.

Defense: And you were found guilty in that trial?

Appellant: Yes, sir, I was.

Defense: And that was of? What were you found guilty?

Appellant: Two counts of murder and Solicitation of Murder.

Defense: Okay. So on September 12th, were you awaiting final sentencing on those cases?

Appellant: Yes, sir. I was awaiting final sentencing.

Because these two (2) murder convictions demonstrated that Brady was murdered by "a person with a prior record of conviction for a capital offense," the trial court correctly denied Appellant's motion for a directed verdict as to the aggravating circumstance. *Commonwealth v. Benham*, Ky., 816 S.W.2d 186, 187 (1991). Although the Commonwealth introduced evidence of all four (4) of Appellant's capital convictions at trial—the latter two (2) of which stemmed from a trial conducted in 1994 and therefore did not constitute part of Appellant's "prior record of conviction of a capital offense" at the time of Brady's murder—we observe that all of them were admissible at the capital sentencing phase pursuant to KRS 532.025(1)(a).

Given our construction of the KRS 532.025(2)(a)(1) aggravating circumstance, we agree with Appellant's contention that the trial court's articulation of that aggravating circumstance changed its meaning. Upon remand, the trial court should instruct the jury in accordance with the statutory language, *i.e.*, "the murder was committed by a person with a prior record of conviction of a capital offense."

## 5. *PENALTY PHASE INSTRUCTIONS*
*(# 8)*

 Appellant raises a number of complaints regarding the trial court's capital sentencing phase jury instructions. Although we find most of these allegations lacking in merit, we agree with Appellant that pursuant to RCr 9.54(1), the trial court was required to read the capital sentencing phase jury instructions to the jury unless both Appellant and the Commonwealth agreed otherwise. Accordingly, upon remand, the trial court shall read its instructions to the jury.

 As to Appellant's other allegations of error in the capital sentencing phase instructions, we hold that the trial court properly declined to instruct the jury that: (1) it could not consider any aggravating factors not enumerated in the instructions, *see Smith v. Commonwealth*, Ky., 599 S.W.2d 900, 911 (1980); (2) jury findings as to mitigating circumstances need not be unanimous, *Perdue*, 916 S.W.2d at 168; *Bowling*, 873 S.W.2d at 181; (3) a verdict of death would result in lethal injection, *Perdue*, 916 S.W.2d at 169; (4) it may not be influenced by passion, prejudice or other arbitrary factors, *Id.*; (5) any juror could grant Appellant mercy "for any reason whatsoever" and that the death penalty could not be imposed if any juror had "any doubt" as to whether death was the appropriate punishment (issues that the trial court addressed properly in its mitigation and reasonable doubt instructions); and (6) it could not impose the death penalty if it had reasonable doubts whether Appellant actually fired the shots that killed Brady, *Smith*, 599 S.W.2d at 909. *See also Perdue*, 916 S.W.2d at 166; *Stanford*, Ky., 854 S.W.2d at 744. Further, we find no error in the trial court's verdict form, *see Hodge*, 17 S.W.3d at 854 (2000), or its description of one of the

jury's sentencing options in accordance with the statutory language, *i.e.*, imprisonment "for life without benefit of probation or parole until he has served a minimum of 25 years of his sentence," instead of the Appellant's proposed description, which omitted the word "probation."

## IV. CONCLUSION

For the above reasons, we affirm the judgment of the Bullitt Circuit Court to the extent that it reflects Appellant's conviction for Murder, but we reverse Appellant's sentence of death and remand the case for the trial court to conduct a new capital sentencing phase.

LAMBERT, C.J., concurs in Parts III(A), (B), (C), (D)(1)-(3) and (5)-(18), (E), (F), and IV and concurs in result only in Part III(D)(4), as to which he joins Justice COOPER'S separate opinion.

COOPER, J., concurs in Parts III(A), (B), (C), (D)(1)-(3) and (5)-(18), (E), and, by separate opinion, concurs in result only as to Part III(D)(4) and dissents in part from Part III(F) and Part IV.

GRAVES, J., concurs.

JOHNSTONE, J., concurs in Parts III(A), (B), (C), (D)(1)-(3) and (5)-(18), (E) and (F) and dissents from Parts III(D)(4) and Part IV, as to which he joins Justice KELLER'S dissenting opinion.

KELLER, J., concurs in Parts III(B), (C), (D)(1)-(3) and (5)-(18), and (E) and concurs in result only as to Part III(A) and dissents from Parts III(D)(4), III(F), and Part IV by separate opinion in which STUMBO, J., joins.

WINTERSHEIMER, J., concurs in result only.

COOPER, Justice, Concurring in Part and Dissenting in Part.

I concur in the majority opinion's affirmance of the jury's verdict of guilt in this case (though not with its analysis of the evidence relating to the Van Zandt deposition) and in its reversal for a new penalty phase trial. However, I dissent from the majority's conclusion that Appellant is eligible for the death penalty in this case.

## I. VAN ZANDT DEPOSITION.

At the time of trial, Bylynn Van Zandt, Appellant's former wife, lived in Durant, Oklahoma. Less than two weeks before trial, the Commonwealth petitioned the trial court for a certificate to obtain her attendance as a witness at trial. KRS 421.250. Five days before trial, the prosecutor informed the court and defense counsel by telephone that Van Zandt's attorney had informed him that due to complications related to her pregnancy, she could not travel to Kentucky. The prosecutor moved for permission to take her testimony by deposition in Oklahoma. Appellant objected on grounds that the prosecutor had provided no documentation that Van Zandt was unable to travel for medical reasons. The issue was argued before the court at an oral hearing on August 17, 1998. The transcript of that hearing states, *inter alia*, as follows:

> Defense: [W]are faced with the record here where the Commonwealth has introduced no evidence that Ms. Van Zandt is in fact unavailable beyond their hearsay say-so and—*okay, they're now handing me . . .*
>
> Pros.: I don't mean to interrupt, your Honor. Here is what happened. As I told the Court on the telephone we literally learned it within minutes—well within an hour of me calling the Court and [defense counsel]. No we didn't have anything other than our word but as officers of the court I would have hoped that would have been sufficient.
>
> We have asked the doctor who was treating Ms. Van Zandt to—we con-

tacted her attorney who notified us of this situation. *The doctor has faxed us this morning a letter showing that she's not able—medically able to travel. And I would have certainly given you this had I had it.*

. . .

This morning, once I received a motion of [defense counsel], this morning we have been in contact with Ms. Van Zandt's attorney and *we hope to supplement* with an affidavit at some point during the trial—his affidavit. Which is substantially going to say *what the doctor's letter or statement has said.* And if the Court wishes, and if [defense counsel] wishes, we will have that letter reduced to affidavit form and have that forwarded by the doctor.

(Emphasis added.) A lengthy debate ensued as to whether the Commonwealth should furnish Appellant with a summary of Van Zandt's expected testimony and whether, for security reasons, it was feasible to have Appellant view the deposition by two-way video transmission instead of transporting him to Oklahoma to attend the deposition in person. The trial judge ultimately allowed Van Zandt's testimony to be taken by deposition. While he denied the motion for a summary of her expected testimony, he required that Appellant be transported to Oklahoma to personally attend the deposition. The deposition was taken in Durant, Oklahoma, on August 23, 1998, in the presence of Appellant and counsel for both parties. At the conclusion of the deposition for the Commonwealth, Appellant separately deposed Van Zandt for the purpose of eliciting mitigating evidence to be presented during the penalty phase of the trial.

Although the faxed statement from Van Zandt's treating physician to the prosecutor is absent from the record, it is obvious from the transcript that the prosecutor handed copies of the statement to both defense counsel and the trial judge when he interrupted Appellant's argument at the August 17, 1998, hearing. Appellant never again mentioned the unavailability issue (possibly because of his own desire to obtain Van Zandt's deposition for mitigating evidence). Prior to the playing of her testimony at trial, Appellant moved to strike her deposition, but only because she had refused on cross-examination to identify another co-conspirator who aided her efforts to hinder Appellant's prosecution.

The majority opinion correctly states that a witness for the Commonwealth in a criminal case cannot be deemed unavailable for purposes of KRE 804 unless the proponent has shown a good-faith effort to obtain the witness's presence at trial. *Lovett v. Commonwealth*, Ky., 103 S.W.3d 72, 82–84 (2003). *Cf. Barber v. Page*, 390 U.S. 719, 724–25, 88 S.Ct. 1318, 1321–22, 20 L.Ed.2d 255 (1968) (witness not unavailable for purposes of Confrontation Clause unless state made a good faith effort to procure her attendance). The burden of proof in this circumstance is on the Commonwealth. *Ohio v. Roberts*, 448 U.S. 56, 74–75, 100 S.Ct. 2531, 2543, 65 L.Ed.2d 597 (1980); *Justice v. Commonwealth*, Ky., 987 S.W.2d 306, 313 (1998) (burden rests on offering party). Here, the Commonwealth made a good faith effort to obtain Van Zandt's presence by utilizing the procedures in KRS 421.250. The real question is not whether the Commonwealth made a good faith effort to obtain Van Zandt's presence but whether the proof was sufficient to support a finding that she was unavailable.

" 'Unavailability' for purposes of KRE 804 is a preliminary issue for the trial judge under KRE 104(a)." Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 845[7], at 644 (4th ed.2003). In considering a preliminary question con-

cerning the admissibility of hearsay evidence, *e.g.*, whether a witness is unavailable, the trial judge "is not bound by the rules of evidence except those with respect to privileges." KRE 104(a); *Turner v. Commonwealth*, Ky., 5 S.W.3d 119, 123 (1999). Thus, there was no need for Van Zandt's doctor to render his opinion in court or even by affidavit. In fact, the trial judge could simply have accepted the prosecutor's hearsay statement that Van Zandt was unavailable because of complications with her pregnancy. In *United States v. McGuire*, 307 F.3d 1192 (9th Cir.2002), it was held that the district court did not abuse its discretion in finding that a witness who was seven months pregnant was unavailable based on her doctor's written but unsworn statement that her advanced pregnancy rendered her unable to undergo the stresses of testimony. *Id.* at 1205. See also *State v. Steward*, 219 Kan. 256, 547 P.2d 773 (1976), which held that a trial court did not abuse its discretion in finding that a witness was unavailable where the prosecutor and an investigator both testified that the witness's treating physician had advised them that the witness was in the late stages of pregnancy and could not travel from Louisiana to Kansas for trial. *Id.* at 780–83.

Similarly, in *Brooks v. Commonwealth*, Ky., 114 S.W.3d 818 (2003), we held that the trial court did not abuse its discretion in relying (1) on the prosecutor's oral and written representations that prison officials where the witness was incarcerated informed him that the witness was too ill to be transported to trial, and (2) the trial court's own confirmation of that information by a telephone conversation with prison officials. *Id.* at 821–22. In *Lovett*, *supra*, we upheld a trial judge's decision to permit the deposition of a critical prosecution witness based on the prosecutor's mere proffer that the witness was in an out-of-state "Teen Challenge" drug-abuse program in South Dakota and could not

obtain a pass to return to Kentucky before trial. *Id.* at 83. (The primary issue in that case was whether the Commonwealth had made a good faith effort to obtain the witness's presence for trial.) I would conclude that the hearsay evidence offered by the prosecutor in this case was sufficient to support the trial court's finding that Van Zandt was unavailable "because of ... existing physical ... infirmity." KRE 804(a)(4).

## II. AGGRAVATING CIRCUMSTANCE.

I also agree with the majority opinion that *Thompson v. Commonwealth*, Ky., 862 S.W.2d 871 (1993), *superseded on other grounds by* RCr 9.38, was wrongly decided and should be overruled. However, the Due Process Clauses of the Fifth and Fourteenth Amendments preclude us from retroactively applying our decision to overrule *Thompson* to Appellant's case. In 1798, the United States Supreme Court identified four types of prohibited ex post facto laws:

> 1st. Every law that makes an action, done before passing of the law, and which was innocent when done, criminal; and punishes such action. 2nd. Every law that aggravates a crime, or makes it greater than it was, when committed. 3rd. *Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.* 4th. Every law that alters the legal rules of evidence, and receives less, or different testimony than the law required at the time of the commission of the offence, in order to convict the offender.

*Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798) (emphasis added). These four categories are still recognized today. *Rogers v. Tennessee*, 532 U.S. 451, 456, 121 S.Ct. 1693, 1697, 149 L.Ed.2d 697 (2001).

In 1964, the United States Supreme Court held that a judicial decision that has the same effect as retroactive legislation violates the "fair warning" requirement of the Due Process Clause.

> When a state court overrules a consistent line of procedural decisions with the retroactive effect of denying a litigant a hearing in a pending case, it thereby deprives him of due process of law "in its primary sense of an opportunity to be heard and to defend (his) substantive right." When a similarly unforeseeable state-court construction of a criminal statute is applied retroactively to subject a person to criminal liability for past conduct, the effect is to deprive him of due process of law in the sense of fair warning that his contemplated conduct constitutes a crime.

*Bouie v. City of Columbia*, 378 U.S. 347, 354–55, 84 S.Ct. 1697, 1703, 12 L.Ed.2d 894 (1964) (citation omitted). While *Bouie* involved a retroactive application of a judicial interpretation of a statute defining substantive criminal conduct, its holding has been consistently applied to judicial interpretations that increase punishment beyond what the defendant could have foreseen at the time of the offense. *E.g., Davis v. Nebraska*, 958 F.2d 831, 833 (8th Cir.1992); *Helton v. Fauver*, 930 F.2d 1040, 1044–45 (3d Cir.1991); *Dale v. Haeberlin*, 878 F.2d 930, 934 (6th Cir.1989); *Devine v. N.M. Dep't of Corr.*, 866 F.2d 339, 344–45 (10th Cir.1989); *People v. King*, 5 Cal.4th 59, 19 Cal.Rptr.2d 233, 851 P.2d 27, 40 (1993); *State v. LeCompte*, 538 A.2d 1102 (Del.1988) (per curiam); *Stevens v. Warden*, 114 Nev. 1217, 969 P.2d 945, 948 (1998); *Commonwealth v. Davis*, 760 A.2d 406, 410 (Pa.Super.Ct.2000). In *United States v. Newman*, 203 F.3d 700 (9th Cir.2000), the United States Court of Appeals for the Ninth Circuit declined to extend *Bouie* to prohibit judicial retroactive increases in punishment, *Id.* at 702, but specifically exempted from its holding

cases involving retroactive constructions of aggravating factors for imposition of the death penalty. *Id.* at 702 n. 2.

Thus, I conclude that the aggravating factor set forth in KRS 532.025(2)(a)(1) cannot be applied to Appellant because *Thompson* was the law of this Commonwealth at the time his offense was committed. Accordingly, I concur in the affirmance of Appellant's conviction but would reverse the sentence and remand for a new sentencing phase trial at which life imprisonment would be the maximum possible penalty.

LAMBERT, C.J., joins as to Part I only of this opinion, concurring in part and dissenting in part.

KELLER, Justice, Concurring in Part and Dissenting in Part.

I vote to reverse Appellant's Murder conviction and to remand the indictment to the trial court for a new trial at which Appellant would face a maximum term of life imprisonment. Specifically, I write separately as to Parts III(D)(4) and III(F)(4) of the Opinion of the Court and I would hold that the trial court committed reversible error by (1) permitting the Commonwealth to introduce Ms. Van Zandt's videotaped deposition without a constitutionally-adequate showing that Ms. Van Zandt was unavailable to testify in person, and (2) failing to grant a directed verdict in Appellant's favor as to the KRS 532.025(2)(a)(1) aggravating circumstance during the capital sentencing phase. Although I disagree with the basis identified in the Opinion of the Court for its reversal of Appellant's death sentence, I concur in the *decision* to reverse Appellant's sentence, but dissent to the extent that the Opinion of the Court affirms Appellant's Murder conviction itself and remands the case for the trial court to conduct a new capital sentencing phase. My resolution of

the aggravating circumstance issue renders moot the other capital sentencing phase errors—including the trial court's failure to instruct the jury upon life without possibility of probation or parole ("LWOP") as an authorized punishment. Accordingly, while I agree with the bottom-line conclusion that, in capital cases involving conduct committed prior to July 15, 1998, a trial court must instruct a jury that LWOP is an authorized punishment if defendant so consents, that holding is not relevant to my analysis because I would hold that, if found guilty of Murder upon remand, Appellant cannot receive a sentence greater than life imprisonment.

Just over two (2) years ago, in *Marshall v. Commonwealth*,[1] this Court *unanimously* stated that "[a] trial court cannot merely rely on the Commonwealth's assurances of unavailability in deciding to admit hearsay evidence that is conditioned upon unavailability."[2] Given that there is *absolutely nothing* in the record of this case to demonstrate Ms. Van Zandt's unavailability *other than* the Commonwealth's representation that Ms. Van Zandt's pregnancy prevented her from traveling to Kentucky, today's opinion's holding that "the trial court did not abuse its discretion in finding Ms. Van Zandt unavailable on the basis of the Commonwealth's assurances"[3] represents a full-scale retreat from *Marshall*. I believe the Court was correct in *Marshall*, and the trial court's finding of unavailability in this case was clearly erroneous.

The Commonwealth had the burden to prove that Ms. Van Zandt was "unavailable" in the constitutional sense by demonstrating its inability to procure her attendance at trial by process or other reasonable means.[4] The record reflects that the Commonwealth utterly failed to meet its burden. The easiest way to illustrate the Commonwealth's failure to satisfy its burden of proof is to compare the record in this case with the record in *Brooks v. Commonwealth*,[5] the most recent published case in which this Court has addressed an allegation of error relating to former testimony introduced because of a witness's unavailability. In *Brooks*, the Commonwealth sought to introduce a witness's former testimony pursuant to KRE 804(b)(1) because the witness, who was incarcerated in a Kentucky prison, had recently attempted to commit suicide. The trial judge granted the Commonwealth's motion to introduce the former testimony after finding that the witness was unavailable to testify at trial. In doing so, the trial court relied upon (1) the prosecutor's oral and written representations that it had been informed by the Kentucky Department of Corrections that the witness "had attempted suicide and would not be available to testify at trial";[6] (2) a sworn affidavit from the prosecutor that contained the same information and included contact information for the persons with whom he had spoken at the Kentucky Correctional Insti-

1. Ky., 60 S.W.3d 513 (2001).

2. *Id.* at 519.

3. *St. Clair v. Commonwealth*, 140 S.W.3d 510, 540, 2004 WL 314613 (2004) (citing *Ruppee v. Commonwealth*, Ky., 821 S.W.2d 484, 486 (1991); *Bruce v. Commonwealth*, Ky., 441 S.W.2d 435, 437 (1969)).

4. *Ohio v. Roberts*, 448 U.S. 56, 74–75, 100 S.Ct. 2531, 65 L.Ed.2d 597, 613 (1980) ("The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to . . . present that witness. As with other evidentiary proponents, the prosecution bears the burden of establishing this predicate.").

5. Ky., 114 S.W.3d 818 (2003).

6. *Id.* at 821.

tute for Women;[7] and (3) the trial judge's own personal investigation in the form of a phone call to correctional facility personnel who verified the witness's suicide attempt and informed the trial judge that to transport the witness for trial would be contrary to medical advice.[8] Given the state of that record, I agreed with the majority's conclusion that the trial court properly allowed the Commonwealth to introduce the unavailable witness's former testimony.[9] In the case at bar, however, the record contains nothing more than the Commonwealth's oral representation that Ms. Van Zandt could not travel to Kentucky for trial. The "doctor's note," which was allegedly in the Commonwealth's possession, was not made a part of the record. Nor did the Commonwealth ask any questions of Ms. Van Zandt during the taking of the videotaped deposition that would provide evidence for its claims regarding her inability to travel. Because "[a]n inspection of the record reveals that the Commonwealth provided virtually no information to the trial court—let alone 'substantial evidence that would support the trial court's finding'[10]—the trial court's unavailability finding was unsupported by substantial evidence and thus clearly er-

roneous. In light of the materiality of Ms. Van Zandt's testimony, which the Commonwealth introduced in order to connect Appellant to property found in Kentucky in order to shed doubt upon his alibi defense, the admission of this evidence without a sufficient showing of unavailability entitles Appellant to a new trial.[11]

In my view, the trial court further erred when it denied Appellant's motion for a directed verdict as to the KRS 532.025(2)(a)(1) aggravating circumstance. Accordingly, I would hold that, if Appellant were to be found guilty upon remand for a new trial (or upon remand for a new sentencing proceeding, as ordered by the majority opinion), he should receive a sentence of imprisonment of between twenty (20) to fifty (50) years or life. In *Thompson v. Commonwealth*,[12] this Court *correctly* interpreted KRS 532.025(2)(a)(1)'s "prior record of conviction for a capital offense" to mean a *final judgment* of conviction for a capital offense. By overruling *Thompson* and adopting a contrary and novel interpretation of the same language, today's opinion not only is inconsistent with Appellant's rights of due process[13] but also turns its back on common sense and its own rules of statutory construction.

7. *Id.*

8. *Id.*

9. *Brooks*, 114 S.W.3d at 826 (Keller, J., dissenting) ("Because substantial evidence supports the trial court's determination that Mary Wood ('Wood') was unavailable to testify at Appellant's third trial, I agree with the majority's conclusion that the trial court properly allowed the Commonwealth to introduce Wood's videotaped prior sworn testimony.").

10. *Lovett v. Commonwealth*, Ky., 103 S.W.3d 72, 85 (2003) (Keller, J., dissenting).

11. My conclusion that Ms. Van Zandt's videotaped testimony should never have been introduced at Appellant's trial renders moot Appellant's other allegations of error concerning Ms. Van Zandt's testimony. I wish to express my view, however, that the Commonwealth's

failure to advise the defense prior to the taking of the videotaped deposition that Ms. Van Zandt had informed two (2) of the prosecuting attorneys that the items of clothing recovered from Brady's truck were *not* the clothes that she had brought to Appellant in Dallas, Texas, constituted a shocking breach of the Commonwealth's discovery obligations that was anathema to Appellant's rights of due process.

12. Ky., 862 S.W.2d 871 (1993).

13. *See Gall v. Parker*, 231 F.3d 265, 305 (6th Cir.2000) ("If the new interpretation was ... unforeseeable, if it was applied to events occurring before its enactment, and if the interpretation disadvantages the offender affected by it, then ... due process is violated just as the *ex post facto* clause would be."); *Tharp v. Commonwealth*, Ky., 40 S.W.3d 356, 362–63

The Opinion of the Court concedes that the term "conviction" is inherently ambiguous and is susceptible to different interpretations, but then fails to apply the "rule of lenity" that "require[s] us to give it the more lenient interpretation" [14] when faced with such ambiguity. The opinion correctly observes that KRS 446.080(4) states that "[a]ll words and phrases shall be construed according to the common and approved usage of language[.]" [15] However, the statute continues further, "but technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law shall be construed according to such meaning." [16] And, although the popular meaning of "conviction" may apply where rights of persons other than the "convict" are involved, in situations "where legal disabilities, disqualifications, and forfeitures are to follow, the strict legal meaning is to be applied, absent some indication of contrary intent." [17] In *Melson v. Commonwealth*,[18] this Court adhered to this principle when it interpreted KRS 532.080(2)'s "having been convicted of one (1) previous felony" language to require a final judgment of conviction.[19] Today's Opinion of the Court interprets KRS 532.025(2)(a)(1)'s "prior record of conviction for a capital offense" language in a manner inconsistent with the technical meaning of "conviction" and thereby creates an anomaly of epic propor-

tions where a non-final capital "conviction" would be insufficient to trigger PFO enhancement, but sufficient to render a defendant death-eligible. "The death penalty cannot be imposed simply because we or the jury believe the actions or motives of a particular defendant are deserving of capital punishment[,]" [20] and this Court must interpret the scope of KRS 532.025(2)(a)'s aggravating circumstance in the same manner that it interprets any legislative enactment—*i.e.*, by applying the rules of statutory construction. A proper application of those rules demonstrates that the Commonwealth was unable to prove that Brady's murder "was committed by a person with a prior record of conviction for a capital offense." Accordingly, the trial court should have directed a verdict in Appellant's favor and instructed the jury to fix Appellant's punishment at a sentence of imprisonment between twenty (20) years to fifty (50) years or life.

Given that a majority of the Court disagrees with my analysis and has voted to remand this case for the trial court to conduct a new capital sentencing phase, I must also express my disagreement with the majority opinion's Part III(C)(3) analysis of Appellant's contention that the trial court unconstitutionally limited the scope of Appellant's individual voir dire. For reasons that I have explained on prior occasions,[21] I would hold that the trial

---

(2000) (" '[D]ue process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope.' ") (*quoting United States v. Lanier*, 520 U.S. 259, 266, 117 S.Ct. 1219, 1225, 137 L.Ed.2d 432 (1997)).

**14.** *Young v. Commonwealth*, Ky., 50 S.W.3d 148, 162 n. 23 (2001) (referencing the rule of lenity in the context of interpreting the KRS 532.025(2)(a)(4) aggravating circumstance).

**15.** KRS 446.080(4).

**16.** *Id.*

**17.** 21A AM. JUR. 2D *Criminal Law* § 1313 at 571–72 (1998).

**18.** Ky., 772 S.W.2d 631 (1989).

**19.** *Id.* at 633.

**20.** *Young*, 50 S.W.3d at 161.

**21.** *See Caudill v. Commonwealth*, Ky., 120 S.W.3d 635, 680–81 (2003) (Keller, J., concurring); *Furnish v. Commonwealth*, Ky.; 95 S.W.3d 34, 54–57 (2002) (Keller, J., concurring in part and dissenting in part), *cert. denied* — U.S. ——, 124 S.Ct. 115, 157 L.Ed.2d

court erroneously restricted Appellant's ability to assess jurors' ability to consider the full range of penalties when it prevented Appellant's trial attorneys from inquiring whether jurors could consider the minimum penalty of twenty (20) years. In my view, the trial court should avoid repetition of this error upon remand.

JOHNSTONE, J., joins in part as to Van Zandt testimony.

STUMBO, J., joins.

80 (2003); *Stopher v. Commonwealth,* Ky., 57 S.W.3d 787, 808–812 (2001) (Keller, J., dissenting), *cert. denied,* 535 U.S. 1059, 122 S.Ct. 1921, 152 L.Ed.2d 829 (2002).